**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

THE HILB GROUP OF NEW YORK, LLC,

                              Plaintiff,

              -against-

ROBERT E. VIDAL II,

                              Defendant.

Civil Action No. 1:23-cv-2479

**COMPLAINT**

---

Plaintiff The Hilb Group of New York, LLC ("THG-NY"), by counsel, states as follows for its Complaint against Robert E. Vidal II ("Vidal"):

<u>**NATURE OF ACTION**</u>

1.      This is an action to address Vidal's misappropriation of—and obstinate failure to destroy or return—confidential and proprietary information regarding THG-NY's vital customer relationships.  Vidal was an employee benefits specialist and insurance producer for THG-NY who voluntarily resigned to go to work for a competing insurance business.  Prior to his departure from THG-NY, Vidal sent to his personal email account a number of documents containing, among other things, valuable data regarding insurance policies and renewals for many of THG-NY's customers.  When THG-NY discovered Vidal's actions, it demanded that Vidal destroy the information and provide adequate assurances that he had done so.  Despite being given ample opportunity to rectify his actions voluntarily, Vidal has continued to hold on to documents belonging to THG-NY, thus forcing this suit.  THG-NY brings this action against Vidal for breach of his restrictive covenant agreement and employment agreement, breach of his duty of loyalty, conversion of THG-NY's property, and misappropriation of THG-NY's trade secrets under the federal Defend Trade Secrets Act and applicable state law.

1

**PARTIES**

2.      THG-NY, a Delaware limited liability company, is a subsidiary of The Hilb Group, LLC ("THG").  THG-NY is authorized to conduct business in the State of New York, and maintains an office in Staten Island, New York.

3.      THG-NY's sole member is The Hilb Group Operating Company, LLC, which is a Delaware limited liability company.

4.      The Hilb Group Operating Company, LLC's sole member is THG, which is a Delaware limited liability company.

5.      THG's sole member is THG Intermediate, LLC, which is a Delaware limited liability company.

6.      THG Intermediate, LLC's sole member is THG Acquisition Company, LLC, which is a Delaware limited liability company.

7.      THG Acquisition Company, LLC's sole member is Harpoon Bidco, Inc., which is a Delaware corporation with its principal place of business in Virginia.

8.      Upon information and belief, Vidal is a citizen of the State of New York who resides and is domiciled in Staten Island, New York.

9.      THG-NY purchased certain assets from Allen C. Bentson Agency, Inc., d/b/a Bentson Insurance Group and/or Bentson & Company ("Bentson"), including all of its customer accounts and associated goodwill, effective May 11, 2018, after which Vidal worked for THG-NY as a Producer until his resignation on or about November 18, 2022.

**JURISDICTION & VENUE**

10.      This Court has personal jurisdiction over Vidal because he is a citizen, resident and

domiciliary of, and subject to service of process in, the State of New York.

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

12.     This Court also has subject matter jurisdiction over this action because THG-NY's claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836, presents a federal question pursuant to 28 U.S.C. § 1331. Furthermore, even in the absence of diversity jurisdiction under 28 U.S.C. § 1332 (which exists as set forth above), this Court has would have supplemental jurisdiction over THG-NY's state-law claims under 28 U.S.C. § 1367 because they are so related to the federal claim as to form part of the same case or controversy.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Vidal resides in this District, as well as pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims occurred in this District.

## FACTS

### THG-NY's Business, Trade Secrets and Customer Relationships

14.     THG-NY is, among other things, in the employee benefits brokerage and administration business. Specifically, THG-NY partners with business owners to broker and administer a range of customized insurance and risk management programs, including middle-market commercial lines, high net worth personal lines, and individual and group benefits. THG-NY also provides consulting services to assist customers with designing and servicing insurance and risk management plans and programs. THG-NY typically renews policies with its customers on an annual or bi-annual basis.

15.     In part due to its cyclical nature, the insurance brokerage and risk management

business is extremely competitive. Accordingly, success in the industry depends in large part on customer relationships and goodwill. Once a customer discontinues its policy or consulting relationship with a particular broker, the customer is unlikely to return.

16.    Moreover, an agency's insurance brokerage and risk management business often is grown through referrals. As such, the loss of one customer's relationship has a ripple effect of harming the agency's future ability to grow and to compete in the marketplace.

17.    For all these reasons, THG-NY and Bentson have expended substantial time and monetary efforts and investments to develop valuable secret, confidential, and proprietary information (collectively, "THG-NY Trade Secrets") relating to their services, customized programs, marketing, pricing and sales to, and relationships with, customers and clients, and relating to strategies, methods, processes, ideas, techniques, algorithms, formulas, and other proprietary material in the insurance and risk management field. The THG-NY Trade Secrets include without limitation compilations of customer-specific information such as policy data, premiums paid, historical revenue, expected renewal information, and other data relating to account strategy and maintenance of business relationships.

18.    The above-described THG-NY Trade Secrets are extremely valuable to THG-NY because they are secret, and were difficult, costly, and time-consuming to compile and develop, and are only known to select individuals at THG-NY, and because such information is not made public and is difficult, if not impossible, to ascertain independently.

19.    THG-NY has exercised reasonable efforts to preserve the secrecy of the above-described THG-NY Trade Secrets.  Among such efforts, many THG-NY employees, such as Vidal, are required to sign agreements not to divulge to any unauthorized person, or to use for any unauthorized purpose, any secret, confidential, or private information connected with THG-NY's

4

business. THG-NY also has its computer systems password protected and requires third parties, such as vendors and suppliers, to execute non-disclosure and/or confidentiality agreements not to disclose to any unauthorized person or entity, any secret, confidential, or private information connected with THG-NY's business.

20.    The THG-NY Trade Secrets provide THG-NY (or any competitor having access to them) a competitive advantage in the sales and marketing of its services to particular customers or clients (especially prior or existing customers and clients).

### *THG-NY's Acquisition of Bentson and Employment of Vidal*

21.    Because of the highly competitive nature of its business, THG and its affiliated companies (each a "Hilb Company" and, collectively, the "Hilb Companies"), including THG-NY, engage in strategic acquisitions to strengthen their position in the marketplace. THG is primarily an acquisition company, which pays market consideration for its various insurance asset acquisitions.

22.    Effective May 11, 2018, THG-NY purchased substantially all of Bentson's assets through an asset purchase agreement.

23.    In the Bentson acquisition, THG-NY acquired all of Bentson's client accounts and relationships, including all insurance expirations and rights of renewal and all the associated goodwill, confidential information, files, claim files, books, records, ledgers, correspondence, and other records.

24.    At the time of the Bentson acquisition, Vidal worked for Bentson as an Employee Benefits Specialist.

25.    As result of the Bentson acquisition, Vidal's employment with Bentson ended and Vidal became employed as a Producer with THG-NY.

26.     In connection with his new employment with THG-NY, Vidal entered into a Producer Employment Agreement ("Employment Agreement"), a copy of which (without accompanying schedules) is attached as **Exhibit 1**.

27.     Vidal's Employment Agreement provides, among other things, that he "will serve in a position of trust and confidence and will owe to [THG-NY] the duties of loyalty and of a fiduciary until the employment relationship is terminated.  [Vidal] accepts and acknowledges [his] fiduciary duties and duties of loyalty to [THG-NY]."

28.     In addition, pursuant to the Employment Agreement, Vidal promised that, "[u]pon the termination of the employment relationship, or whenever requested by [THG-NY]," he "shall immediately deliver to [THG-NY] all of the property of [THG-NY] or its affiliates in [Vidal's] possession or under [Vidal's] control . . . ."

29.     As a condition of his employment with THG-NY, and acknowledging that by virtue of such employment he would have access to certain confidential and proprietary business information and trade secrets of THG-NY and other Hilb Companies, Vidal also executed a Confidentiality and Non-Solicitation Agreement (the "Restrictive Covenant Agreement"), effective May 11, 2018, a copy of which is attached as **Exhibit 2**.

30.     Vidal executed the Restrictive Covenant Agreement voluntarily and without any coercion because he wanted to be employed by, and to receive compensation from, THG-NY. In exchange, THG-NY agreed to employ him and to compensate him handsomely for his services.

31.     As a Producer, Vidal served in a client-facing role for THG-NY. His duties included soliciting and sales of insurance and other products to new and existing customers, managing customer relationships, assisting customers with renewals, assisting customers with claims, and providing other services to ensure customer satisfaction.

32.     Vidal developed and maintained relationships and contacts with THG-NY's customers, including customers THG-NY acquired in the Bentson acquisition.  Vidal had knowledge of and access to, among other things, the identities of THG-NY customers, their policy types, renewal dates, pricing, and other confidential information.

### *THG-NY's Efforts to Protect Its Customer Relationships and Goodwill*

33.     Customer relationships and goodwill are of the utmost importance in THG-NY's industry. Accordingly, THG-NY invests substantial resources into its business producers to establish goodwill and strong relationships with customers. THG-NY is therefore vulnerable to producers who improperly leverage for their own benefit those relationships and the THG-NY Trade Secrets they received during the course of their employment.

34.     THG-NY thus has a legitimate business interest in protecting its confidential information, customer relationships, and customer goodwill, including the confidential information, relationships and goodwill it acquired in the Bentson acquisition and other THG-NY Trade Secrets.

35.     To protect these legitimate business interests and the THG-NY Trade Secrets, THG-NY required Vidal to execute and abide by certain obligations in the Restrictive Covenant Agreement.  Indeed, Vidal acknowledged in the Restrictive Covenant Agreement that THG-NY's "willingness to provide Confidential Information and Trade Secrets to [Vidal] is in consideration for, and ancillary to, [Vidal's] agreement to the other terms set forth in this Agreement, including the restrictive covenants" set forth in the Restrictive Covenant Agreement.

36.     According to Section 1 of the Restrictive Covenant Agreement, "[a]ll Confidential Information of the Hilb Companies, which [Vidal] has access to, receives or generates during the course of [Vidal's] employment with [THG-NY], shall be the sole property of the

relevant Hilb Company and shall remain with the relevant Hilb Company upon termination of [Vidal's] employment."

37.     Under Section 1 of the Restrictive Covenant Agreement, Vidal cannot "use or disclose any Confidential Information" except in the normal course of business on behalf of THG-NY or to the extent necessary to comply with law, court order, or government agency investigation.

38.     The Restrictive Covenant Agreement defines "Confidential Information" to mean "any information defined as Trade Secrets, and any confidential or proprietary information of a Hilb Company that is not already generally available to the public . . . from which a Hilb Company derives value by virtue of its not being known to others, and with respect to which a Hilb Company takes reasonable steps to maintain as confidential."

39.     The term "Trade Secrets" is further defined under the Restrictive Covenant Agreement to include valuable non-public information that provides any of the Hilb Companies with a competitive advantage, such as "the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums" of THG-NY clients.

40.     In addition, regarding customers and prospective customers of THG-NY, Section 2.1 of the Restrictive Covenant Agreement requires that, for a period of two years following the termination of his employment, Vidal will not, among other things, directly or indirectly:  (a) "solicit to provide, sell or provide Competitive Services to . . . or induce the termination, cancellation or non-renewal of any Hilb Company's business relationship with, any Hilb Company client whose Client Account [Vidal] managed or regularly serviced . . ."; or (b) "solicit to provide, sell or provide Competitive Services to . . . any Active Prospective Client that [Vidal] solicited to provide Competitive Services on behalf of the Hilb Companies . . . and/or about

which [Vidal] obtained Confidential Information and/or Trade Secrets during and by virtue of [his] employment with the Hilb Companies . . . ."

41.     At the time Vidal executed the Restrictive Covenant Agreement, and at all times relevant since then, Vidal was and has been fully aware of the non-disclosure, non-solicitation and other contractual obligations imposed on him by the Restrictive Covenant Agreement.

***Vidal Departs THG-NY for a Competitor and Takes Confidential and Proprietary Information***

42.     Vidal resigned from his employment with THG-NY on November 18, 2022.

43.     Following his departure from THG-NY, Vidal began employment in a similar position as Vice President, Employee Benefits with USI Insurance Services ("USI"), a direct competitor of the THG-NY.

44.     Prior to leaving employment with THG-NY, Vidal, on at least four separate occasions, sent confidential business and customer information belonging to THG-NY, including THG-NY Trade Secrets, to his personal email address.

45.     On November 2, 2022, Vidal sent a spreadsheet from his Bentson email address to his personal email address that contains a list of insurance carriers, along with their website portal addresses and username/password information for accessing those sites.

46.     Also on November 2, 2022, Vidal sent from his Bentson email address to his personal email address a Commission Payable Statement, dated September 30, 2022, setting forth a fifteen-page list of THG-NY customer accounts, along with corresponding policy numbers, effective dates, transaction types, and information detailing the calculation of commissions on the listed accounts.

47.     On November 8, 2022, Vidal forwarded an e-mail string from his Bentson email address to his personal email address.  That string, between Vidal and several other THG-NY

employees, concerned transitioning the Bentson book of business (owned by THG-NY) to others within the company following Vidal's departure from the agency.  As part of that string, Vidal was provided a spreadsheet entitled "Bentson – Full BOB," which contains THG-NY individual and group account names, along with information regarding the carrier, plan type, plan name, policy/group number, renewal date, and renewal status for many of the accounts.

48.     On November 17, 2022, the day before his departure from Bentson, Vidal forwarded from his Bentson email address to both his personal email account and his new USI email address an email with attachments related to a THG-NY client, which included information regarding the client's benefit plans and renewal options.

### THG-NY's Discovery of Vidal's Actions and Attempts to Address Them Directly with Vidal and USI

49.     Following Vidal's departure, THG-NY learned on or about November 29, 2022, that one of its customers, whose account Vidal handled while employed by THG-NY, copied Vidal on email correspondence regarding its account, using Vidal's USI e-mail address.  As a result, THG-NY became concerned that Vidal may have engaged in customer solicitation in violation of his Restrictive Covenant Agreement.

50.     Subsequently, in December 2022, James Butler, the CEO of USI's Northeast Region, contacted Robert Bentson of THG-NY regarding several customer accounts that Vidal indicated he would like to bring over to USI.  Butler acknowledged that Vidal's Restrictive Covenant Agreement would prevent him from doing business with such clients during the restricted period and proposed a potential purchase of the accounts by USI.

51.     While THG-NY was considering Vidal's request to allow USI to purchase the accounts referenced by Mr. Butler, on or about January 17, 2023, another customer that Vidal had serviced while employed with THG-NY informed THG-NY that Vidal had been in contact with

the customer on multiple occasions that month about the customer's insurance needs. This customer was not among the accounts Vidal had asked THG-NY to consider selling to USI, thereby heightening THG-NY's concerns that Vidal was actively soliciting his former accounts in violation of the Restrictive Covenant Agreement.

52.    On or around January 18, 2023, after a search of Vidal's company email account, THG-NY discovered that Vidal had sent to his personal email account the above described e-mails containing confidential and proprietary information regarding customers of THG-NY and their policies.

53.    THG-NY, through its counsel, thereafter sent Vidal a letter on January 20, 2023, alerting Vidal to its concerns regarding his customer contacts, confirming that in light of his actions THG-NY had no interest in selling the accounts that USI had referenced on Vidal's behalf, and demanding that Vidal take appropriate action to address his misappropriation of THG-NY's confidential business information and trade secrets. A copy of THG-NY's letter is attached as **Exhibit 3** (customer names redacted).

54.    THG-NY set forth, among other things, the steps it demanded be taken by Vidal to address his misappropriation of THG-NY confidential business information and THG-NY Trade Secrets. THG-NY's letter further instructed that, after the completion of the described process, Vidal must "submit a sworn affidavit confirming that (1) [he has] returned and/or deleted all of the Hilb Companies' information in [his] possession or control; and (2) [he] reaffirm[s] and will abide by the terms of the [Restrictive Covenant Agreement] going forward."

55.    THG-NY sent USI a copy of its January 20 letter to Vidal, along with a cover letter addressing its concerns.

56.    On January 26, 2023, Vidal responded to THG-NY's letter by e-mail to its

counsel, with a copy to counsel for USI.   A copy of Vidal's January 26, 2023 e-mail is attached as **Exhibit 4** (customer name redacted**).**   Among other things, Vidal acknowledged sending himself the emails referenced in the January 20 letter and stated that he would destroy them as requested, noting that he would "await [THG-NY's counsel's] direction concerning the emails." Vidal also stated that he had "consulted with USI counsel and been advised to respond to your request and reaffirm my commitment to abide my covenants."

57.      Thereafter, counsel for THG-NY coordinated with counsel for USI in an effort to address (a) deficiencies in Vidal's response to THG-NY's January 20 letter, (b) USI's search for THG-NY information that Vidal may have placed on its system, and (c) preparation of an affidavit for Mr. Vidal's signature to memorialize corrective actions taken.  As part of that process, USI's counsel requested that THG-NY's counsel prepare the affidavit for Vidal's signature for USI counsel to review with him.

58.      On February 21, 2023, counsel for THG-NY sent to counsel for USI two proposed affidavits, one for execution by Vidal and the other for execution by USI's counsel.

59.      The affidavit for USI's counsel described, among other things, the search undertaken by USI's counsel for emails from Vidal's Bentson email account or personal email account and the instruction given by USI counsel to Vidal to abide by the terms of the Restrictive Covenant Agreement.

60.      The affidavit for Vidal set forth, among other things, confirmations that Vidal (a) emailed to his personal and/or USI account certain confidential customer and business information belonging to THG-NY and/or THG (collectively, the "Hilb Group Confidential Information"); (b) had deleted or destroyed all of the Hilb Group Confidential Information his possession, including the Hilb Group Confidential Information contained in emails on his personal

account, retaining no copies in any form; and (c) affirms the Restrictive Covenant Agreement and promises to comply with its terms.

### Vidal Fails to Provide Assurances that He has Deleted or Destroyed THG-NY's Confidential Business Information, Confirms that He Maintains Certain Unidentified THG-NY Information in His Possession, and Refuses to Reaffirm His Commitments Under the Restrictive Covenant Agreement

61.     Following inquiries from THG-NY's counsel on March 1 and 6, 2023 regarding the status of the proposed affidavits, by email of March 8, 2023, USI's counsel provided USI's affidavit, which had been executed by USI without revision.  Regarding Vidal, USI's counsel stated that Vidal "had some concerns about the affidavit," which "really are outside the scope of his USI employment."

62.     On March 10, 2023, USI's counsel stated that Vidal "is consulting with his personal counsel and he or counsel will be responding concerning this affidavit."

63.     On March 15, 2023, THG-NY's counsel sent a follow-up email to Vidal and USI counsel asking Vidal to "provide (or have your counsel provide if you are represented) the signed affidavit or any proposed revisions" by Friday, March 17.

64.     By response that same day, Vidal responded:  "Hi, I'm still unclear why this affidavit is needed.  You already have a signed non complete [sic].  I have copied my attorney and at this point we can remove the USI counsel."   Vidal's email attached a copy of an affidavit that contained material revisions to the document original proposed by THG-NY.

65.     Among other revisions, Vidal had deleted the paragraphs of the original affidavit describing the emails he had sent from his Bentson account to his personal email account and to his USI account.  Critically, the revisions also altered the paragraph of the original affidavit confirming that Vidal had destroyed all Hilb Group Confidential Information in his possession.  Instead, Vidal inserted language carving out from the representation unspecified "records

13

concerning my compensation." Vidal also deleted the sentence in the original affidavit that affirmed the Restrictive Covenant Agreement and his promise to comply with its terms.

66.     THG-NY's counsel thereafter sent Vidal's counsel an email the evening of March 15 noting that "I have done a comparison between the original affidavit I sent to Mr. Vidal and the revised version attached to his email today. A redline showing the changes is attached. These changes are concerning and require discussion. Please let me know your availability for a call."

67.     On March 16, 2023, THG-NY's counsel and Vidal's counsel convened a call during which they discussed, among other things, the revisions that Vidal had made to the affidavit, which were unacceptable to THG-NY. During that call, Vidal's counsel was unable to identify the materials that Vidal had retained as "records concerning [his] compensation."

68.     On Friday, March 17, Vidal, through his counsel, returned a signed copy of the revised affidavit that THG-NY had previously explained was unacceptable.

69.     THG-NY, through its counsel, again explained that the revised affidavit was unacceptable because it did not provide assurances (a) that Vidal had in fact deleted all Hilb Group Confidential Information in his possession (and, to the contrary confirmed that Vidal still possesses certain unspecified information belonging to THG-NY) or (b) that Vidal intends to abide by the Restrictive Covenant Agreement going forward. A copy of THG-NY's counsel's email of March 18, 2023 to counsel for Vidal, which includes their previous email string, is attached as **Exhibit 5** (customer names redacted).

70.     THG-NY requested that Vidal execute and return the original affidavit providing the necessary assurances by March 20, 2023, but Vidal did not respond further.

71.     As a result of the foregoing, upon information and belief, Vidal continues to

have in his possession confidential and proprietary information regarding THG-NY's customers, including information that represents THG-NY Trade Secrets.

72.     Vidal's actions demonstrate that he has no intention of complying with his restrictive covenant and other legal obligations to THG-NY in the future.

73.     Vidal's misconduct was, and continues to be, wanton, malicious, and in reckless disregard for the rights of THG-NY.

74.     THG-NY has been and continues to be irreparably harmed by Vidal's actions.

<u>**COUNT I**</u>
**(Breach of the Restrictive Covenant Agreement)**

75.     THG-NY incorporates by reference all allegations set forth above in paragraphs 1 through 74 as if fully set forth herein.

76.     The Restrictive Covenant Agreement is, and at all times relevant has been, a valid, binding, and legally enforceable contract between THG-NY and Vidal.

77.     The restraints imposed by the Restrictive Covenant Agreement, including Sections 1 and 2 thereof, are no greater than is required for the protection of the legitimate interests of THG-NY, do not impose undue hardship on Vidal, and are not injurious to the public.

78.     Vidal breached Section 1 of the Restrictive Covenant Agreement by, at a minimum, taking for himself, disclosing to USI (by sending information to his USI email account), and refusing to return materials constituting Confidential Information under the Restrictive Covenant Agreement.

79.     Upon information and belief, Vidal also breached Section 2.1 of the Restrictive Covenant Agreement by, at a minimum, soliciting on behalf of himself and/or USI to provide Competitive Services (as defined in the Restrictive Covenant Agreement) to THG-NY clients whose Client Account (as defined in the Restrictive Covenant Agreement) he managed or regularly

serviced or about which he obtained Confidential Information during the 18 months prior to the termination of Vidal's employment with THG-NY.

80.     Vidal's breach of the Restrictive Covenant Agreement has proximately caused damage in the form of financial harm to THG-NY in an amount to be proven at trial, but more than $75,000.  THG-NY has further suffered irreparable harm that is not compensable by money damages and may only be remedied by injunctive relief.

**COUNT II**
**(Breach of the Employment Agreement)**

81.     THG-NY incorporates by reference all allegations set forth above in paragraphs 1 through 74 as if fully set forth herein.

82.     The Employment Agreement is, and at all times relevant has been, a valid, binding, and legally enforceable contract between THG-NY and Vidal.

83.     Vidal breached the Employment Agreement by, at a minimum, taking THG-NY confidential and propriety customer information for his own benefit, disclosing such information to USI (by sending information to his USI email account), and thereafter failing to deliver and return to THG-NY all of its property in his possession, both upon the termination of his employment and upon the request of THG-NY.

84.     Vidal's breach of the Employment Agreement has proximately caused damage in the form of financial harm to THG-NY in an amount to be proven at trial, but more than $75,000. THG-NY has further suffered irreparable harm that is not compensable by money damages and may only be remedied by injunctive relief.

**COUNT III**
**(Breach of Duty of Loyalty)**

85.     THG-NY incorporates by reference all allegations set forth above in paragraphs

1 through 74 as if fully set forth herein.

86.     Vidal had a common law duty of loyalty to THG-NY not to use his position for his own personal benefit, or for the benefit of another company, and/or to hinder THG-NY's ability to succeed in its business operations.

87.     Vidal specifically acknowledged his duty of loyalty to THG-NY in the Employment Agreement.

88.     Vidal breached his duty of loyalty to THG-NY by misappropriating its property, including confidential and propriety business information, while employed by THG-NY.

89.     Vidal's breach of his duty of loyalty has proximately caused damage in the form of financial harm to THG-NY in an amount to be proven at trial, but more than $75,000.  THG-NY has further suffered irreparable harm that is not compensable by money damages and may only be remedied by injunctive relief.

90.     By breaching his duty of loyalty to THG-NY, Vidal acted with malice, wantonness, bad faith, and with the specific intent to cause harm to THG-NY.  Accordingly, to punish Vidal and to deter him from engaging in such misconduct, THG-NY is entitled to punitive damages in an amount to be determined at trial.

## COUNT IV
### (Conversion)

91.     THG-NY incorporates by reference all allegations set forth above in paragraphs 1 through 74 as if fully set forth herein.

92.     Vidal, intentionally and without authority, assumed and exercised control over personal property belonging to THG-NY, interfering with THG-NY's right of possession of such property.

93.     Vidal's conversion of THG-NY's property has proximately caused damage in

the form of financial harm to THG-NY in an amount to be proven at trial, but more than $75,000. THG-NY has further suffered irreparable harm that is not compensable by money damages and may only be remedied by injunctive relief.

94.     By converting THG-NY's property to his own benefit, Vidal acted with malice, wantonness, bad faith, and with the specific intent to cause harm to THG-NY.  Accordingly, to punish Vidal and to deter him from engaging in such misconduct, THG-NY is entitled to punitive damages in an amount to be determined at trial.

## COUNT V
## Trade Secret Misappropriation—Defend Trade Secrets Act, 18 U.S.C. § 1836

95.     THG-NY incorporates by reference all allegations set forth above in paragraphs 1 through 74 as if fully set forth herein.

96.     THG-NY owns certain confidential, proprietary, and secret information (i.e., the THG-NY Trade Secrets) alleged above, which constitute trade secrets within the meaning of 18 U.S.C. § 1839(3).

97.     THG-NY has taken reasonable measures to keep the THG-NY Trade Secrets secret.

98.     The THG-NY Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the acquisition, disclosure, or use of the information.

99.     The THG-NY Trade Secrets relate to products and services used or intended for use in interstate commerce.

100.     Materials attached to the emails described above that Vidal sent from his Bentson email account to his personal email account included THG-NY Trade Secrets.

101.     In violation of THG-NY's rights, Vidal misappropriated THG-NY Trade Secrets

by emailing them from his Bentson email account to his personal email account as described above, and upon information and belief, Vidal continues to misappropriate THG-NY Trade Secrets by his failure and refusal to destroy or return THG-NY Trade Secrets in his possession.

102.    As the direct and proximate result of Vidal's conduct, THG-NY has suffered and, if not stopped, will continue to suffer, irreparable injury and significant damages, in an amount to be proven at trial, but more than $75,000.

103.    Because THG-NY's remedy at law is inadequate, THG-NY also seeks injunctive relief to recover and protect its trade secrets and other legitimate business interests.

104.    Because Vidal willfully and maliciously misappropriated THG-NY's trade secrets, THG-NY is entitled to recover exemplary damages and attorney fees.

<u>**COUNT VI**</u>
**(Misappropriation of Trade Secrets Under State Law against Defendants)**

105.    THG-NY incorporates by reference all allegations set forth above in paragraphs 1 through 74 as if fully set forth herein.

106.    THG-NY owns certain confidential, proprietary, and secret information (i.e., the THG-NY Trade Secrets) alleged above, which include trade secrets under state law.

107.    THG-NY has taken reasonable measures to keep the THG-NY Trade Secrets secret.

108.    The THG-NY Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the acquisition, disclosure, or use of the information.

109.    Materials attached to the emails described above that Vidal sent from his Bentson email account to his personal email account included THG-NY Trade Secrets.

110.    In violation of THG-NY's rights, Vidal misappropriated THG-NY Trade Secrets

by emailing them from his Bentson email account to his personal email account as described above, and upon information and belief, Vidal continues to misappropriate THG-NY Trade Secrets by his failure and refusal to destroy or return THG-NY Trade Secrets in his possession.

111.    As the direct and proximate result of Vidal's conduct, THG-NY has suffered and, if not stopped, will continue to suffer, irreparable injury and significant damages, in an amount to be proven at trial, but more than $75,000.

112.    Because THG-NY's remedy at law is inadequate, THG-NY also seeks injunctive relief to recover and protect its trade secrets and other legitimate business interests.

113.    Because Vidal willfully and maliciously misappropriated THG-NY's trade secrets, THG-NY is entitled to recover exemplary damages and attorney fees.

## REQUEST FOR INJUNCTIVE RELIEF

114.    THG-NY incorporates by reference the foregoing paragraphs of this Complaint.

115.    By virtue of the allegations in this Complaint, THG-NY has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Vidal.

116.    Unless Vidal is permanently enjoined from engaging in any additional misconduct, THG-NY will be irreparably harmed in the marketplace by, at a minimum, the continued theft and misappropriation of the THG-NY Trade Secrets and Confidential Information.

117.    Such misconduct would result in substantial loss which is unascertainable at this point in time, and future economic loss which is presently incalculable, but which exceeds $75,000.

118.    The threatened injury to THG-NY, an organization whose value—and related ability to employ thousands of individuals—is tied in with preserving the sanctity of its trade

secrets, customer relationships and goodwill, far outweighs the potential harm to Vidal, who can earn a livelihood in a manner that does not violate or interfere with the THG-NY Trade Secrets or the Restrictive Covenant Agreement.

119.    Enforcing legal and valid contracts, preventing unfair competition and misuse and theft of trade secrets is always in the public interest. Vidal agreed to abide by his restrictive covenant obligations to THG-NY. As such, the entry of injunction to enforce these legal and valid agreements would be consistent with—and not adverse to—the public interest.

120.    Unless Vidal is preliminarily enjoined from engaging in any additional misconduct, THG-NY will be irreparably harmed in the marketplace by, at a minimum, continued misuse and theft of the THG-NY Trade Secrets and Confidential Information.

121.    THG-NY has no adequate remedy at law for Vidal's misconduct, and Vidal has contractually agreed in his Restrictive Covenant Agreement with THG-NY that THG-NY shall be entitled to injunctive relief to enforce the restrictions in the agreement, with such relief specifically including a temporary and/or permanent injunction, along with such other equitable relief as may be appropriate under the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, THG-NY respectfully requests the following:

A.    Injunctive relief against Vidal requiring him to comply with his obligations under the Restrictive Covenant Agreement;

B.    Injunctive relief against Vidal requiring him to comply with his obligations under the Employment Agreement;

C.    An order for specific performance requiring Vidal to comply with his obligations under the Restrictive Covenant Agreement in accordance with its terms;

D.    An order for specific performance requiring Vidal to comply with his obligations under the Employment Agreement in accordance with its terms;

E.    An order requiring Vidal to return all THG-NY Trade Secrets, Confidential Information, and other THG-NY property in his possession and control;

F.    Actual damages against Vidal in excess of $75,000, in an amount to be determined at trial;

G.    Damages for any unjust enrichment caused by the misappropriation of trade secrets that is not addressed in computing damages for actual loss;

H.    Exemplary and punitive damages in an amount to be determined at trial;

I.    Attorneys' fees and costs;

J.    Interest; and

K.    Any other relief the Court deems appropriate.

Date: March 31, 2023

OF COUNSEL:
Andrew P. Sherrod (VSB No. 45854)
(*pro hac vice* motion to be filed)
HIRSCHLER FLEISCHER,
A PROFESSIONAL CORPORATION
2100 East Cary Street
Richmond, Virginia  23223-7078
Tel:  (804) 771-9575
Fax:  (804) 644-0957
E-mail:  asherrod@hirchlerlaw.com

Respectfully submitted,

By: _____
John F. Olsen (JO 8553)
The Law Office of John F. Olsen, LLC
105 Grove Street, Suite 6
Montclair, NJ 07042
Tel: (973) 932-0474
Fax: (973) 453-8264
E-mail:  jolsen@jfolsenlaw.com

*Attorneys for Plaintiff The Hilb Group of New York, LLC*

15939763.2 041373.00001

# Exhibit 1

## PRODUCER EMPLOYMENT AGREEMENT

This PRODUCER EMPLOYMENT AGREEMENT ("Agreement"), effective May 1, 2018, is made by and between The Hilb Group of New York, LLC, a Delaware limited liability company ("Company"), and Robert Vidal ("Employee") (collectively referred to as the "Parties").

WHEREAS, Company desires to employ Employee to render certain services on behalf of Company, as more particularly described below; and

WHEREAS, Employee desires to be so employed by Company on the terms and conditions set forth herein.

NOW, THEREFORE, for and in consideration of the mutual covenants, conditions and promises contained herein, the Parties hereto agree as follows:

1.    **At-Will Employment**.  Employee's employment with Company is at-will, and either Employee or Company may terminate Employee's employment at any time and for any reason.

2.    **Job Description**.  Company hereby employs Employee in the position of Producer.  Employee shall report to the President of the Company or the President's designee. Employee's duties shall include insurance sales to new and renewal accounts, client management and assistance, and other duties that may be assigned to Employee from time to time at the direction and control of the President of the Company.  Employee shall devote substantially all of Employee's time, attention and energy to the job duties as described above.  Employee agrees to provide the services called for in this Agreement faithfully, diligently and to the best of Employee's ability

3.    **Conflicts of Interest**.  Employee agrees that, while employed with the Company, Employee will not perform any activities or services, or accept such other employment, which would present a conflict of interest with Employee's employment with the Company.  So that the Company can evaluate potential conflicts of interest, Employee shall disclose to the President of the Company or the President's designee, (a) any and all business activities conducted by the Employee outside the Company ("Outside Business Activities") and (b) any and all compensation derived from such Outside Business Activities. Such disclosure shall be made at such times, and in such form, as requested by the President of the Company.

4.    **Compensation**.  While employed, the Company shall compensate Employee according to the terms of the Commission Grid attached hereto as **Schedule A**, which may be amended by the Company from time to time in the Company's sole discretion.  Employer shall deduct and withhold from any compensation payable to Employee all Federal and state income taxes, FICA taxes, unemployment taxes and similar payroll reductions as may be required by applicable law, as well as any voluntary payroll reductions of Employee.

5. **Benefits**. Employee shall be entitled to participate, to the extent eligible, in any employee benefit programs or plans offered by the Company to its full-time Producer employees. Employee benefits are subject to change at any time in the Company's sole discretion.

6. **Loyalty and Fiduciary Duty**. While employed by the Company, Employee will serve in a position of trust and confidence and will owe to Company the duties of loyalty and of a fiduciary until the employment relationship is terminated. Employee accepts and acknowledges Employee's fiduciary duties and duties of loyalty to the Company.

7. **Restrictive Covenants**. As a condition of Employee's employment with the Company, the Employee shall execute the Producer Confidentiality and Non-Solicitation Agreement attached hereto as **Schedule B**.

8. **Return of Employer's Property**. Upon the termination of the employment relationship, or whenever requested by Company, Employee shall immediately deliver to the Company all of the property of the Company or its affiliates in Employee's possession or under Employee's control in good condition, except for ordinary wear and tear and damage resulting from causes beyond the control of Employee.

9. **Representations Regarding Prior Employment**. Employee represents and warrants to the Company that: (a) Employee is not bound by any contract, agreement or other restriction that would purport to prohibit or impair Employee's ability to fully carry out Employee's duties as described in this Agreement; (b) Employee has not and will not misappropriate any trade secrets or other documents or property belonging to any former employer of Employee; and (c) Employee shall not perform any act in connection with Employee's employment with the Company which would subject Employee or the Company to any action, suit, or any other claim by any third party ensuing from an alleged breach by Employee of any contract or agreement between Employee and any former employer of Employee. Employee hereby indemnifies and holds harmless the Company from all costs (including attorneys' fees), liabilities and damages of every sort incurred by the Company and arising, directly or indirectly, from Employee's breach or alleged breach of any such agreement.

10. **Applicable Law**. This Agreement and all Schedules thereto shall be interpreted and enforced in accordance with the laws of the State referenced in the "Applicable Law" Section of the Producer Confidentiality and Non-Solicitation Agreement attached hereto as **Schedule B**, without regard to any conflicts of law provisions or principles to the contrary.

11. **Entire Agreement**. This Agreement and attached Schedules contain the entire agreement and understanding among the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, whether written or oral, relating to such subject matter in any way. This Agreement may be amended, or any provision of this Agreement may be waived, only upon the approval, in a writing, executed by Employee and the Company.

IN WITNESS WHEREOF, the Parties hereto have executed this Producer Employment Agreement as of the Effective Date.

**COMPANY**:    THE HILB GROUP OF NEW YORK, LLC,
a Delaware limited liability company

By: _____

Name: _____

Title: _____

**EMPLOYEE**:

Robert Vidal

Digitally signed by Robert Vidal II
DN: cn=Robert Vidal II, o=Bentson
Insurance Group, ou,
email=robertv@bentson.net, c=US
Date: 2019.03.28 16:27:40 -04'00'

_____

3

# Exhibit 2

EXECUTION VERSION

## CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

This CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT (this "**Agreement**") is effective as of May 11, 2018 (the "**Effective Date**"), by and between The Hilb Group of New York, LLC, a Delaware limited liability company (the "**Company**"), and Robert Vidal ("**Employee**"). The Company and Employee are collectively referred to hereinafter as the "**Parties**."

R E C I T A L S:

WHEREAS, the Company, Allen C. Bentson Agency, Inc. d/b/a Bentson Insurance Group, a New York corporation, Robert P. Bentson, Allen C. Bentson, Jr. and Donald Bentson, the owners of Seller, have entered into that certain Asset Purchase Agreement, effective as of the date hereof (the "**Purchase Agreement**");

WHEREAS, prior to the closing of the Purchase Agreement, Employee provided services for compensation to Seller;

WHEREAS, the Company is an indirect wholly owned subsidiary of The Hilb Group, LLC, a Delaware limited liability company ("**THG**");

WHEREAS, Employee is or desires to become an employee of the Company, and by virtue of such employment, Employee has and/or will have access to and be given Confidential Information of THG and its affiliated companies (each, a "**Hilb Company**," and together, the "**Hilb Companies**"), including Trade Secrets of the Hilb Companies;

WHEREAS, Employee acknowledges and agrees that the Company has a reasonable, necessary and legitimate business interest in protecting its own and the Hilb Companies' Trade Secrets and Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill and ongoing business, and that the terms and conditions herein are reasonable and necessary to protect these legitimate business interests; and

WHEREAS, Seller and the Company are parties to that certain Transition Services Agreement, dated as of the date hereof (the "**TSA**"), whereby Seller are delivering various services to the Company through Seller' employees, including Employee. Employee will temporarily continue to be an employee of Seller pursuant to the TSA, until such services requiring Employee to perform services for Seller are terminated (the "**Interim Period**"). During the Interim Period, Employee will receive all compensation and benefits from Seller, consistent with past practices of Seller.

NOW THEREFORE, in consideration of Employee's employment with the Company, and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the Parties, intending to become legally bound, agree as follows:

1.    **CONFIDENTIALITY.**    The Hilb Companies may provide Employee with Confidential Information, including Trade Secrets of the Hilb Companies, to assist Employee in the course and scope of Employee's duties. Employee acknowledges that the Hilb Companies' willingness to provide Confidential Information and Trade Secrets to Employee is in consideration for, and ancillary to, Employee's agreement to the other terms set forth in this Agreement, including the restrictive covenants set forth below. Employee further acknowledges and agrees that the Hilb Companies have a reasonable, necessary and legitimate business interest in protecting their Confidential Information, and that the terms and conditions of this Section 1 are reasonable and necessary to protect these legitimate business interests. All Confidential Information of the Hilb Companies, which Employee has access to, receives or generates during the

course of Employee's employment with the Company, shall be the sole property of the relevant Hilb Company and shall remain with the relevant Hilb Company upon termination of Employee's employment. Employee will not use or disclose any Confidential Information, except (a) in the normal course of business on behalf of the Company or (b) to the extent necessary to comply with law or the valid order of a court of competent jurisdiction or to truthfully cooperate with any governmental or administrative agency or entity in any investigation or inquiry. In addition, Employee will use reasonable efforts to prevent any such prohibited use or disclosure by any other person.

2.    **NON-SOLICITATION AND NON-INTERFERENCE.**    During the Interim Period, Employee's actions performed as an employee of Seller on behalf of the Company, pursuant to the TSA, shall not be restricted by these restrictive covenants below, as such restrictive covenants would otherwise prohibit Employee's actions performed as an employee of Seller.

2.1.    *Non-Solicitation.*    Employee shall not, without the Company's prior written consent, directly or indirectly: (a) solicit to provide, sell or provide Competitive Services to, consult regarding the provision of Competitive Services for, sign or accept a broker of record letter concerning Competitive Services with, or induce the termination, cancellation or non-renewal of any Hilb Company's business relationship with, any Hilb Company client whose Client Account Employee managed or regularly serviced on behalf of the Hilb Companies, Seller or its affiliates, successors or assigns, and/or about which Employee obtained Confidential Information and/or Trade Secrets on behalf of the Hilb Companies, Seller or its affiliates, successors or assigns during and by virtue of Employee's employment with the Hilb Companies, Seller or its affiliates, successors or assigns, in each case, at any time during the 18 months prior to the date of the termination of Employee's employment, for any or no reason, with the Hilb Companies and their affiliates, successors and assigns (the "**Employment Cessation Date**"); and/or (b) solicit to provide, sell or provide Competitive Services to, consult regarding the provision of Competitive Services for, or sign or accept a broker of record letter concerning Competitive Services with, any Active Prospective Client that Employee solicited to provide Competitive Services on behalf of the Hilb Companies, Seller or its affiliates, successors and assigns and/or about which Employee obtained Confidential Information and/or Trade Secrets during and by virtue of Employee's employment with the Hilb Companies, Seller or its affiliates, successors and assigns, in each case, at any time during the six months prior to the Employment Cessation Date. These restrictions shall apply during Employee's employment by the Hilb Companies and their affiliates, successors or assigns and for the two years immediately following the Employment Cessation Date. Notwithstanding anything to the contrary contained herein, the Parties acknowledge and agree that this Section 2.1 does not prohibit and shall not be construed as prohibiting Employee from soliciting to provide, selling or providing any products or services other than Competitive Services or from engaging in any activities that do not compete with the business conducted by the Hilb Companies during Employee's employment by the Hilb Companies and their affiliates, successors or assigns. Employee acknowledges and agrees that the Trade Secrets constitute trade secrets of the Hilb Companies, and that the Hilb Companies have a reasonable, necessary and legitimate business interest in protecting their Trade Secrets, and that the terms and conditions of this non-solicitation provision are reasonable and necessary to protect such Trade Secrets.

2.2.    *Non-Interference.*    Employee shall not, directly or indirectly: (a) solicit the employment, consulting or other services of, or hire or engage, any employee or individual independent contractor of any Hilb Company or (b) otherwise induce any individual to leave or reduce his or her employment or engagement or to breach an employment agreement therewith. These restrictions shall apply during Employee's employment by the Hilb Companies or their affiliates, successors or assigns and for the two years immediately following the Employment Cessation Date. An employee shall be deemed covered by this Section 2.2 while so employed and for a period of one year thereafter.

3.    **MODIFICATION.**    If a court finds that any provision of this Agreement exceeds the time,

geographic or scope limitations permitted by applicable law, the restrictions shall be reformed to the maximum time, geographic or scope limitations permissible. If a court refuses to enforce any term of these provisions, then the unenforceable terms shall be eliminated, blue penciled or otherwise modified by the court to the extent necessary to permit the remaining terms to be enforced to the fullest extent permitted by applicable law.

4.    **INDEPENDENT ENFORCEMENT.**    Each of the covenants in this Agreement shall be construed as an agreement independent of (a) any other agreements between Employee and any of the Hilb Companies and (b) any other provision in this Agreement, and the existence of any claim or cause of action by Employee against any of the Hilb Companies, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Employee or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of any of the covenants set forth in Sections 1 and 2 of this Agreement by reason of any breach of (i) any other part of this Agreement or (ii) any other agreement between Employee and any of the Hilb Companies.

5.    **EMPLOYEE'S REPRESENTATIONS AND WARRANTIES.**    Employee represents and warrants to the Company that, except as such actions relate to Seller as the "prior employer": (a) Employee has previously supplied to the Company all agreements between Employee and any entity which has employed Employee in the last five years, and that Employee's execution of this Agreement and the performance of Employee's duties for the Company do not conflict with, and are not impaired by, any law, rule, regulation, court order or agreement by which Employee is bound; (b) Employee has not removed from any prior employer any non-public, confidential, proprietary and/or trade secret information, and that Employee has no such non-public, confidential, proprietary and/or trade secret information in Employee's possession or control in any form including electronic media, and that Employee will not use any such non-public, confidential, proprietary and/or trade secret information in the performance of Employee's duties for the Company; (c) Employee has not taken any copyrighted materials from any prior employer, that Employee has no such copyrighted materials in Employee's possession, and that Employee will not use any such copyrighted materials in the performance of Employee's duties for the Company; (d) except as disclosed in the attached Exhibit A, Employee is not and has not been subject to the provisions of any sales and purchase agreement entered into within the past five years with any organization, individual or business entity which prevents or restricts Employee from competing with, or soliciting the clients, customers, business or employees (including, without limitation, for the purposes of hiring such employees) of, such other organization, individual or business entity for any period of time or within any geographical area, whether heretofore expired or not; (e) Employee has not made any contact with any clients of any former employer concerning Employee's prospective employment relationship and/or Employee's employment relationship with the Company, and that Employee will not, without the prior express direction of the Company's Chief Executive Officer or THG Board of Directors, solicit any clients of any former employer; (f) Employee has not and shall not make any contact with any employees of any former employer concerning their prospective employment relationship with the Company, without the prior express direction of the Company's Chief Executive Officer or THG Board of Directors; and (g) Employee has no ownership rights to any Client Accounts, including, but not limited to, any client accounts of Seller prior to the Closing.

6.    **REMEDY.**    Employee acknowledges that the services to be rendered by Employee are of a special, unique and extraordinary character and that it would be extremely difficult or impracticable to replace such services, that the material provisions of this Agreement are of crucial importance to the Hilb Companies, and that any damage caused by the breach of Sections 1 and/or 2 of this Agreement would result in irreparable harm to the business of the Hilb Companies for which money damages alone would not be adequate compensation. Accordingly, upon such breach by Employee, the Company (or any other Hilb Company) shall, in addition to any other rights or remedies of the Company (or any other Hilb

Company) available at law, be entitled to, without posting a bond or proving irreparable harm or injury, equitable relief in any court of competent jurisdiction, including, without limitation, temporary and permanent injunction.

7.    **AT-WILL EMPLOYMENT.**  Employee acknowledges and agrees that this Agreement shall not be construed or considered in any manner to affect any aspect of Employee's at-will employment by the Company, meaning the Company or Employee may terminate Employee's employment for any reason or no reason, with or without advance notice. This Agreement does not constitute a contract of employment for a definite term.

8.    **ENTIRE AGREEMENT; NO AMENDMENT; GOVERNING LAW.**  This Agreement represents the entire Agreement between the Parties concerning the specific subject matter hereof, and supersedes any prior agreement between the Parties concerning the specific subject matter hereof.  No amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by Employee and an authorized representative of the Company.  This Agreement shall be construed by and governed in accordance with the laws of the State of Delaware without regard to principles of conflicts of law.

9.    **SEVERABILITY.**  The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal and enforceable.  In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render it valid, legal and enforceable to the fullest extent permitted by law.  It is expressly understood and agreed between Employee and the Company that such modification or restriction may be accomplished by mutual accord between the Parties or, alternatively, by disposition of a court of law.  If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

10.    **ASSIGNMENT.**  Employee may not assign any rights under this Agreement without the prior written consent of the Company.  Employee's obligations under this Agreement inure to the Company, its successors and assigns.  The Company may, at any time and without Employee's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor with which Employee may become employed.  Any such successor or assign is expressly authorized to enforce the terms of this Agreement.

11.    **DEFEND TRADE SECRETS ACT NOTICE.**  An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret if: (a) the disclosure of the trade secret is made in confidence to a government official, either directly or indirectly, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law; (b) the disclosure of the trade secret is made in a complaint or other document filed in a lawsuit, if such filing is made under seal; or (c) if an individual files a lawsuit alleging retaliation by an employer for reporting a suspected violation of law, if the disclosure of the trade secret is made to the attorney of the individual or used in the court proceeding so long as the filing of any document containing the trade secret is under seal and the trade secret is not disclosed except under court order.

12.    **DEFINITIONS.**

"**Active Prospective Client**" means any Person, or group of Persons, which, in the two years preceding the Employment Cessation Date, any Hilb Company or either Seller had specifically identified as a potential client.

"**Client Account**" means the account of any client who or which (a) is serviced by a Hilb Company in connection with such Hilb Company's business, regardless of whether such services are provided by or through the licenses of a Hilb Company or any owner, employee or agent of a Hilb Company, or (b) was serviced by either Seller and acquired pursuant to the Purchase Agreement, regardless of whether a Hilb Company has yet provided services to such client or such services are provided by or through the licenses of a Hilb Company or any owner, employee or agent of a Hilb Company.

"**Competitive Services**" means any insurance or employee benefit consulting service that (a) engages in business in the same markets or jurisdictions as any of the Hilb Companies and (b) competes, or is reasonably anticipated to compete, with a product or service which any of the Hilb Companies has sold, marketed, distributed or developed in the last two years of Employee's employment with either Seller or any Hilb Company, or about which Employee has acquired Confidential Information.

"**Confidential Information**" means, at any date, any information defined as Trade Secrets, and any confidential or proprietary information of a Hilb Company that is not already generally available to the public (unless such information has entered the public domain and becomes available to the public through fault on the part of the party to be charged hereunder), from which a Hilb Company derives value by virtue of its not being known to others, and with respect to which a Hilb Company takes reasonable steps to maintain as confidential.

"**Goodwill**" means the expectation of continued patronage from client accounts and new patronage from prospective clients based on the Company's investment in repeated contacts, business transactions and other efforts to develop lasting client relationships.

"**Person**" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, a limited liability partnership or a governmental entity.

"**Trade Secrets**" means, at any date, any information of any of the Hilb Companies that is not already generally available to the public (unless such information has entered the public domain and becomes available to the public through fault on the part of the party to be charged hereunder), and which is valuable to any of the Hilb Companies and/or provides any of the Hilb Companies with a competitive advantage, including, but not limited to, the following: (a) the identity of any Active Prospective Clients and any clients of any of the Hilb Companies and any analyses and compilations thereof, (b) the identity, authority and responsibilities of key contacts and decision-makers employed by any Active Prospective Clients or any clients of any of the Hilb Companies, (c) the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of any Active Prospective Clients and any clients of any of the Hilb Companies, (d) the terms and conditions of the benefits and compensation plans of any Active Prospective Clients and any clients of any of the Hilb Companies, (e) information furnished to any of the Hilb Companies in confidence by its clients and Active Prospective Clients, (f) the business plans, marketing strategies and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of any of the Hilb Companies, and (g) any and all other information that constitutes a trade secret under the governing trade secrets laws.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**Company:**

The Hilb Group of New York, LLC

By: _____

Name:   Richard G. Spiro

Title:   Chief Executive Officer

**Employee:**

Name: _____

[Signature Page to Confidentiality Agreement]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**Company:**

The Hilb Group of New York, LLC

By: _____
Name:   Richard G. Spiro
Title:    Chief Executive Officer

**Employee:**

By: _Robert Vidal_____
Name:   Robert Vidal

EXHIBIT A

Disclosures

NONE

# Exhibit 3

# Hirschler

Andrew P. Sherrod
D  804 771 9575
asherrod@hirschlerlaw.com

Hirschler Fleischer | hirschlerlaw.com
2100 East Cary Street | Richmond, VA  23223
P  804 771 9500 | F  804 644 0957

January 20, 2023

**VIA E-MAIL & OVERNIGHT DELIVERY**

Robert Vidal
USI Insurance Services
261 Madison Avenue, 5th Floor
New York, New York 10016
robert.vidal@usi.com

Dear Mr. Vidal:

> **Re:    The Hilb Group of New York, LLC**

My firm represents The Hilb Group, LLC ("THG") and its subsidiary, The Hilb Group of New York, LLC, d/b/a Bentson Insurance Group ("Bentson" or the "Company"), your former employer. Please review this letter with care, as you must stringently adhere to my clients' instructions in order to avoid litigation.

My clients understand that, following your departure from Bentson on or about November 18, 2022, you have begun employment as a Vice President for Employee Benefits at USI Insurance Services ("USI"), a direct competitor of THG and Bentson.  In light of your new employment with USI, it is important to emphasize your continuing obligations to Bentson and THG under your Confidentiality and Non-Solicitation Agreement dated May 11, 2018 (the "Agreement"), a copy of which in enclosed. You must strictly comply with the terms of the Agreement to avoid potential liability for both yourself and USI.  Unfortunately, information obtained by my clients suggests that you have not done so.

Regarding customers and prospects, the Agreement requires that, for a period of two years following the termination of your employment with Bentson, you will not, among other things, directly or indirectly:  (a) "solicit to provide, sell or provide Competitive Services to . . . or induce the termination, cancellation or non-renewal of any Hilb Company's business relationship with, any Hilb Company client whose Client Account [you] managed or regularly serviced . . ."; or (b) "solicit to provide, sell or provide Competitive Services to . . . any Active Prospective Client that [you] solicited to provide Competitive Services on behalf of the Hilb Companies . . . and/or about which [you] obtained Confidential Information and/or Trade Secrets during and by virtue of [your] employment with the Hilb Companies . . . ."  The terms "Competitive Services," "Client Account," "Active Prospective Client," "Confidential Information," and "Trade Secrets" are all defined clearly in the Agreement.

January 20, 2023
Page 2

The Agreement also provides that, for a period of two years following the termination of your employment with Bentson, you will not, directly or indirectly, solicit, hire or engage any employee or independent contractor of THG or any of its affiliated companies (the "Hilb Companies"), nor shall you induce any individual to leave or reduce his or her employment or engagement with any of the Hilb Companies.

During your employment with Bentson, you also had access to and were provided confidential business information and trade secrets of THG, Bentson, and other Hilb Companies. The Agreement provides that you will not use or disclose any Confidential Information of the Hilb Companies to any other person or entity unless and until such information becomes public through no fault of your own, or unless you are compelled, required, or protected by law to make such disclosure.

As you know, THG and Bentson have invested significant time and resources into developing relationships with their customers, prospects, and employees, as well as into creating and safeguarding the companies' confidential business information and trade secrets. The covenants set forth in the Agreement are narrowly tailored to protect those legitimate business interests, and the Company expects that you will honor your obligations to uphold those interests under the Agreement and applicable law.



On or about November 29, 2022, my clients became aware that their client ███████████ ██████████ an account you handled while employed at Bentson, copied you on email correspondence regarding its account via your new USI e-mail address. Subsequently, Jim Butler, CEO of USI's Northeast Region, contacted Robert Bentson regarding several accounts that you would like to bring over to USI—namely, ████████████████████████ Please note that the terms of the Agreement would forbid you from soliciting or accepting competitive business from these accounts for the two-year covenant period following your departure from Bentson.

To my clients' dismay, while they were considering your request related to the accounts referenced above, on or about January 17, 2023, another account you previously serviced, ██████ ████████ contacted Bentson and informed its representative that you had been *in regular contact with them several times this month* about their insurance needs – on behalf of USI. As ████████████ was not among the accounts you asked my clients to consider, they are understandably concerned that you are actively soliciting your former accounts in violation of the Agreement.

Even more disturbingly, my clients have just discovered that in the days leading up to your departure from Bentson, you sent highly confidential business and customer information of Bentson to your personal email address. While their investigation is on-going, to date my clients have discovered at least four instances in which you sent the Company's confidential and proprietary business information to your personal email account:

January 20, 2023
Page 3

- On November 2, 2022, you sent a spreadsheet from your Bentson email address to your personal email address (Robvidal@yahoo.com) that contains a list of carriers, along with their website portal addresses and username/password information for those sites.
- Also on November 2, 2022, you sent from your Bentson email address to your personal email address a Commission Payable Statement, dated September 30, 2022, setting forth a list of Company accounts, along with corresponding policy numbers, effective dates, and information detailing the calculation of your commissions on the listed accounts.
- On November 8, 2022, you forwarded an e-mail string from your Bentson email address to your personal email address. That string, between yourself and several other Company employees, concerned transitioning the Bentson book of business to others within the Company following your departure. As part of that string, you were provided a spreadsheet entitled "Bentson – Full BOB," which contains Bentson individual and group account names, along with information regarding the carrier, plan type, plan name, policy/group number, renewal date, and renewal status for many of the accounts.
- On November 17, 2022, the day before your departure from Bentson, you forwarded from your Bentson email address to both your personal email account *and* your new USI email address an email with attachments related to Bentson client ██████████ which included information regarding the client's plans and renewal options.

Please be advised that THG and Bentson consider the foregoing items to be Confidential Information under the Agreement, which you are not permitted to use or disclose. Furthermore, my clients contends that certain of that information—for example, the "Bentson – Full BOB" spreadsheet—rises to the level of a trade secret protected from misappropriation under applicable state law and the federal Defend Trade Secrets Act.

Given your actions, my clients are not inclined to agree to your request to discuss transitioning the referenced accounts prior to the expiration of the restrictive covenant period set forth in the Agreement. Instead, please consider this letter as notice that THG and Bentson expect strict compliance with all of your obligations under the Agreement.

Furthermore, for good reason, my clients are concerned that you will, if you have not done so already, further violate both your legal and contractual duties to THG and the Company by disclosing their confidential business and customer information to USI or by using it to solicit business from your former accounts for the benefit of USI. As a result, THG and Bentson stand prepared to take appropriate legal action necessary to enforce their rights and to seek the full measure of remedies to which the Company is entitled. If you wish to avoid such action, you must, within seven (7) days of this letter, proceed as follows:

- Disclose the names of any customers or prospective customers covered under Section 2.1 of the Agreement that you have contacted since leaving Bentson.

January 20, 2023
Page 4

- Identify all devices or servers on which you have stored or copied the above-referenced emails, the information contained in those emails, and/or any other Confidential Information of Bentson, THG, or any of the other Hilb Companies.
- Identify any individuals outside of Bentson, THG, or any of the other Hilb Companies to whom you have disclosed any information contained in the above-referenced emails and/or any other Confidential Information of Bentson, THG, or any of the other Hilb Companies—specifically including but not limited to any USI personnel to whom you have disclosed such information.
- To the extent that any of the foregoing information has been placed on USI devices or servers or otherwise disclosed to USI personnel, immediately quarantine such information so that it cannot be used by anyone at USI.
- Allow a Company representative or consultant to supervise and coordinate the deletion of any Confidential Information from your home computer(s), personal e-mail account, USI email account or devices, and any other electronic devices or media on which such information is stored.
- After the completion of the foregoing procedures, submit a sworn affidavit confirming that (1) you have returned and/or deleted all of the Hilb Companies' information in your possession or control; and (2) you reaffirm and will abide by the terms of the Agreement going forward.

We look forward to your prompt response. Pending resolution of this matter, my clients reserve all rights and waive none.

Sincerely,

Andrew P. Sherrod

APS/rw
Enclosure
cc:    VIA OVERNIGHT DELIVERY
       Ernest J. Newborn, II, Esquire
       Senior Vice President & General Counsel
       USI Insurance Services
       100 Summit Lake Drive, Suite 400
       Valhalla, New York 10595

EXECUTION VERSION

## CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

This CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT (this "**Agreement**") is effective as of May 11, 2018 (the "**Effective Date**"), by and between The Hilb Group of New York, LLC, a Delaware limited liability company (the "**Company**"), and Robert Vidal ("**Employee**"). The Company and Employee are collectively referred to hereinafter as the "**Parties**."

R E C I T A L S:

WHEREAS, the Company, Allen C. Bentson Agency, Inc. d/b/a Bentson Insurance Group, a New York corporation, Robert P. Bentson, Allen C. Bentson, Jr. and Donald Bentson, the owners of Seller, have entered into that certain Asset Purchase Agreement, effective as of the date hereof (the "**Purchase Agreement**");

WHEREAS, prior to the closing of the Purchase Agreement, Employee provided services for compensation to Seller;

WHEREAS, the Company is an indirect wholly owned subsidiary of The Hilb Group, LLC, a Delaware limited liability company ("**THG**");

WHEREAS, Employee is or desires to become an employee of the Company, and by virtue of such employment, Employee has and/or will have access to and be given Confidential Information of THG and its affiliated companies (each, a "**Hilb Company**," and together, the "**Hilb Companies**"), including Trade Secrets of the Hilb Companies;

WHEREAS, Employee acknowledges and agrees that the Company has a reasonable, necessary and legitimate business interest in protecting its own and the Hilb Companies' Trade Secrets and Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill and ongoing business, and that the terms and conditions herein are reasonable and necessary to protect these legitimate business interests; and

WHEREAS, Seller and the Company are parties to that certain Transition Services Agreement, dated as of the date hereof (the "**TSA**"), whereby Seller are delivering various services to the Company through Seller' employees, including Employee. Employee will temporarily continue to be an employee of Seller pursuant to the TSA, until such services requiring Employee to perform services for Seller are terminated (the "**Interim Period**"). During the Interim Period, Employee will receive all compensation and benefits from Seller, consistent with past practices of Seller.

NOW THEREFORE, in consideration of Employee's employment with the Company, and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the Parties, intending to become legally bound, agree as follows:

1. **CONFIDENTIALITY.** The Hilb Companies may provide Employee with Confidential Information, including Trade Secrets of the Hilb Companies, to assist Employee in the course and scope of Employee's duties. Employee acknowledges that the Hilb Companies' willingness to provide Confidential Information and Trade Secrets to Employee is in consideration for, and ancillary to, Employee's agreement to the other terms set forth in this Agreement, including the restrictive covenants set forth below. Employee further acknowledges and agrees that the Hilb Companies have a reasonable, necessary and legitimate business interest in protecting their Confidential Information, and that the terms and conditions of this Section 1 are reasonable and necessary to protect these legitimate business interests. All Confidential Information of the Hilb Companies, which Employee has access to, receives or generates during the

course of Employee's employment with the Company, shall be the sole property of the relevant Hilb Company and shall remain with the relevant Hilb Company upon termination of Employee's employment. Employee will not use or disclose any Confidential Information, except (a) in the normal course of business on behalf of the Company or (b) to the extent necessary to comply with law or the valid order of a court of competent jurisdiction or to truthfully cooperate with any governmental or administrative agency or entity in any investigation or inquiry. In addition, Employee will use reasonable efforts to prevent any such prohibited use or disclosure by any other person.

2.     **NON-SOLICITATION AND NON-INTERFERENCE.**     During the Interim Period, Employee's actions performed as an employee of Seller on behalf of the Company, pursuant to the TSA, shall not be restricted by these restrictive covenants below, as such restrictive covenants would otherwise prohibit Employee's actions performed as an employee of Seller.

2.1.    *Non-Solicitation.*  Employee shall not, without the Company's prior written consent, directly or indirectly: (a) solicit to provide, sell or provide Competitive Services to, consult regarding the provision of Competitive Services for, sign or accept a broker of record letter concerning Competitive Services with, or induce the termination, cancellation or non-renewal of any Hilb Company's business relationship with, any Hilb Company client whose Client Account Employee managed or regularly serviced on behalf of the Hilb Companies, Seller or its affiliates, successors or assigns, and/or about which Employee obtained Confidential Information and/or Trade Secrets on behalf of the Hilb Companies, Seller or its affiliates, successors or assigns during and by virtue of Employee's employment with the Hilb Companies, Seller or its affiliates, successors or assigns, in each case, at any time during the 18 months prior to the date of the termination of Employee's employment, for any or no reason, with the Hilb Companies and their affiliates, successors and assigns (the "**Employment Cessation Date**"); and/or (b) solicit to provide, sell or provide Competitive Services to, consult regarding the provision of Competitive Services for, or sign or accept a broker of record letter concerning Competitive Services with, any Active Prospective Client that Employee solicited to provide Competitive Services on behalf of the Hilb Companies, Seller or its affiliates, successors and assigns and/or about which Employee obtained Confidential Information and/or Trade Secrets during and by virtue of Employee's employment with the Hilb Companies, Seller or its affiliates, successors and assigns, in each case, at any time during the six months prior to the Employment Cessation Date. These restrictions shall apply during Employee's employment by the Hilb Companies and their affiliates, successors or assigns and for the two years immediately following the Employment Cessation Date. Notwithstanding anything to the contrary contained herein, the Parties acknowledge and agree that this Section 2.1 does not prohibit and shall not be construed as prohibiting Employee from soliciting to provide, selling or providing any products or services other than Competitive Services or from engaging in any activities that do not compete with the business conducted by the Hilb Companies during Employee's employment by the Hilb Companies and their affiliates, successors or assigns.  Employee acknowledges and agrees that the Trade Secrets constitute trade secrets of the Hilb Companies, and that the Hilb Companies have a reasonable, necessary and legitimate business interest in protecting their Trade Secrets, and that the terms and conditions of this non-solicitation provision are reasonable and necessary to protect such Trade Secrets.

2.2.    *Non-Interference.*  Employee shall not, directly or indirectly: (a) solicit the employment, consulting or other services of, or hire or engage, any employee or individual independent contractor of any Hilb Company or (b) otherwise induce any individual to leave or reduce his or her employment or engagement or to breach an employment agreement therewith. · These restrictions shall apply during Employee's employment by the Hilb Companies or their affiliates, successors or assigns and for the two years immediately following the Employment Cessation Date. An employee shall be deemed covered by this Section 2.2 while so employed and for a period of one year thereafter.

3.     **MODIFICATION.**  If a court finds that any provision of this Agreement exceeds the time,

geographic or scope limitations permitted by applicable law, the restrictions shall be reformed to the maximum time, geographic or scope limitations permissible. If a court refuses to enforce any term of these provisions, then the unenforceable terms shall be eliminated, blue penciled or otherwise modified by the court to the extent necessary to permit the remaining terms to be enforced to the fullest extent permitted by applicable law.

4.    **INDEPENDENT ENFORCEMENT.**    Each of the covenants in this Agreement shall be construed as an agreement independent of (a) any other agreements between Employee and any of the Hilb Companies and (b) any other provision in this Agreement, and the existence of any claim or cause of action by Employee against any of the Hilb Companies, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Employee or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of any of the covenants set forth in Sections 1 and 2 of this Agreement by reason of any breach of (i) any other part of this Agreement or (ii) any other agreement between Employee and any of the Hilb Companies.

5.    **EMPLOYEE'S REPRESENTATIONS AND WARRANTIES.**    Employee represents and warrants to the Company that, except as such actions relate to Seller as the "prior employer": (a) Employee has previously supplied to the Company all agreements between Employee and any entity which has employed Employee in the last five years, and that Employee's execution of this Agreement and the performance of Employee's duties for the Company do not conflict with, and are not impaired by, any law, rule, regulation, court order or agreement by which Employee is bound; (b) Employee has not removed from any prior employer any non-public, confidential, proprietary and/or trade secret information, and that Employee has no such non-public, confidential, proprietary and/or trade secret information in Employee's possession or control in any form including electronic media, and that Employee will not use any such non-public, confidential, proprietary and/or trade secret information in the performance of Employee's duties for the Company; (c) Employee has not taken any copyrighted materials from any prior employer, that Employee has no such copyrighted materials in Employee's possession, and that Employee will not use any such copyrighted materials in the performance of Employee's duties for the Company; (d) except as disclosed in the attached Exhibit A, Employee is not and has not been subject to the provisions of any sales and purchase agreement entered into within the past five years with any organization, individual or business entity which prevents or restricts Employee from competing with, or soliciting the clients, customers, business or employees (including, without limitation, for the purposes of hiring such employees) of, such other organization, individual or business entity for any period of time or within any geographical area, whether heretofore expired or not; (e) Employee has not made any contact with any clients of any former employer concerning Employee's prospective employment relationship and/or Employee's employment relationship with the Company, and that Employee will not, without the prior express direction of the Company's Chief Executive Officer or THG Board of Directors, solicit any clients of any former employer; (f) Employee has not and shall not make any contact with any employees of any former employer concerning their prospective employment relationship with the Company, without the prior express direction of the Company's Chief Executive Officer or THG Board of Directors; and (g) Employee has no ownership rights to any Client Accounts, including, but not limited to, any client accounts of Seller prior to the Closing.

6.    **REMEDY.**    Employee acknowledges that the services to be rendered by Employee are of a special, unique and extraordinary character and that it would be extremely difficult or impracticable to replace such services, that the material provisions of this Agreement are of crucial importance to the Hilb Companies, and that any damage caused by the breach of Sections 1 and/or 2 of this Agreement would result in irreparable harm to the business of the Hilb Companies for which money damages alone would not be adequate compensation. Accordingly, upon such breach by Employee, the Company (or any other Hilb Company) shall, in addition to any other rights or remedies of the Company (or any other Hilb

Company) available at law, be entitled to, without posting a bond or proving irreparable harm or injury, equitable relief in any court of competent jurisdiction, including, without limitation, temporary and permanent injunction.

7.     **AT-WILL EMPLOYMENT.** Employee acknowledges and agrees that this Agreement shall not be construed or considered in any manner to affect any aspect of Employee's at-will employment by the Company, meaning the Company or Employee may terminate Employee's employment for any reason or no reason, with or without advance notice. This Agreement does not constitute a contract of employment for a definite term.

8.     **ENTIRE AGREEMENT; NO AMENDMENT; GOVERNING LAW.** This Agreement represents the entire Agreement between the Parties concerning the specific subject matter hereof, and supersedes any prior agreement between the Parties concerning the specific subject matter hereof. No amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by Employee and an authorized representative of the Company. This Agreement shall be construed by and governed in accordance with the laws of the State of Delaware without regard to principles of conflicts of law.

9.     **SEVERABILITY.** The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render it valid, legal and enforceable to the fullest extent permitted by law. It is expressly understood and agreed between Employee and the Company that such modification or restriction may be accomplished by mutual accord between the Parties or, alternatively, by disposition of a court of law. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

10.     **ASSIGNMENT.** Employee may not assign any rights under this Agreement without the prior written consent of the Company. Employee's obligations under this Agreement inure to the Company, its successors and assigns. The Company may, at any time and without Employee's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor with which Employee may become employed. Any such successor or assign is expressly authorized to enforce the terms of this Agreement.

11.     **DEFEND TRADE SECRETS ACT NOTICE.** An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret if: (a) the disclosure of the trade secret is made in confidence to a government official, either directly or indirectly, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law; (b) the disclosure of the trade secret is made in a complaint or other document filed in a lawsuit, if such filing is made under seal; or (c) if an individual files a lawsuit alleging retaliation by an employer for reporting a suspected violation of law, if the disclosure of the trade secret is made to the attorney of the individual or used in the court proceeding so long as the filing of any document containing the trade secret is under seal and the trade secret is not disclosed except under court order.

12.     **DEFINITIONS.**

"**Active Prospective Client**" means any Person, or group of Persons, which, in the two years preceding the Employment Cessation Date, any Hilb Company or either Seller had specifically identified as a potential client.

"**Client Account**" means the account of any client who or which (a) is serviced by a Hilb Company in connection with such Hilb Company's business, regardless of whether such services are provided by or through the licenses of a Hilb Company or any owner, employee or agent of a Hilb Company, or (b) was serviced by either Seller and acquired pursuant to the Purchase Agreement, regardless of whether a Hilb Company has yet provided services to such client or such services are provided by or through the licenses of a Hilb Company or any owner, employee or agent of a Hilb Company.

"**Competitive Services**" means any insurance or employee benefit consulting service that (a) engages in business in the same markets or jurisdictions as any of the Hilb Companies and (b) competes, or is reasonably anticipated to compete, with a product or service which any of the Hilb Companies has sold, marketed, distributed or developed in the last two years of Employee's employment with either Seller or any Hilb Company, or about which Employee has acquired Confidential Information.

"**Confidential Information**" means, at any date, any information defined as Trade Secrets, and any confidential or proprietary information of a Hilb Company that is not already generally available to the public (unless such information has entered the public domain and becomes available to the public through fault on the part of the party to be charged hereunder), from which a Hilb Company derives value by virtue of its not being known to others, and with respect to which a Hilb Company takes reasonable steps to maintain as confidential.

"**Goodwill**" means the expectation of continued patronage from client accounts and new patronage from prospective clients based on the Company's investment in repeated contacts, business transactions and other efforts to develop lasting client relationships.

"**Person**" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, a limited liability partnership or a governmental entity.

"**Trade Secrets**" means, at any date, any information of any of the Hilb Companies that is not already generally available to the public (unless such information has entered the public domain and becomes available to the public through fault on the part of the party to be charged hereunder), and which is valuable to any of the Hilb Companies and/or provides any of the Hilb Companies with a competitive advantage, including, but not limited to, the following: (a) the identity of any Active Prospective Clients and any clients of any of the Hilb Companies and any analyses and compilations thereof, (b) the identity, authority and responsibilities of key contacts and decision-makers employed by any Active Prospective Clients or any clients of any of the Hilb Companies, (c) the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of any Active Prospective Clients and any clients of any of the Hilb Companies, (d) the terms and conditions of the benefits and compensation plans of any Active Prospective Clients and any clients of any of the Hilb Companies, (e) information furnished to any of the Hilb Companies in confidence by its clients and Active Prospective Clients, (f) the business plans, marketing strategies and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of any of the Hilb Companies, and (g) any and all other information that constitutes a trade secret under the governing trade secrets laws.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**Company:**                                                    **Employee:**

The Hilb Group of New York, LLC

By: _____                                 Name: _____
Name:   Richard G. Spiro
Title:   Chief Executive Officer

[Signature Page to Confidentiality Agreement]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**Company:**                                              **Employee:**

The Hilb Group of New York, LLC

By: _____              By: _____
Name:   Richard G. Spiro                            Name:   Robert Vidal
Title:    Chief Executive Officer

**EXHIBIT A**

**Disclosures**

NONE

# Exhibit 4

**From:** Robert Vidal <robert.vidal@usi.com>
**Sent:** Thursday, January 26, 2023 11:32 AM
**To:** Robin White
**Cc:** Andrew Sherrod; Christopher Murray
**Subject:** [EXTERNAL] RE: The Hilb Group of New York, LLC

Andrew:

This letter is in response to your letter of 1/20/23. At the outset, please let me assure you that it was never my intention to violate my agreement with HILB. As you know, none of my former clients have moved to USI, nor would USI accept any of my former clients during my restricted period, without an agreement with HILB.

In addressing your specific concerns, let me advise you that several of my client have reached out to me without prompting. I have and will continue to direct those clients back to HILB for servicing.

With respect to emails I sent to myself at the time of my departure from HILB:

- I forwarded usernames and passwords corresponding with my personal appointments with several carriers as I believed I would need those for future work with those carriers. I have not accessed those appointments and will permanently delete such information at your request
- I send commission statements concerning a discrepancy over back commissions with HILB. I can delate that email as well but would appreciate if you can confirm with Hilb that I am not owed $2,946.85
- The remaining emails concerning ███████████████ and Rampart were sent because I believed I might get follow up questions on those accounts from HILB, again I will delete those emails permanently at your request

I have consulted with USI counsel and been advised to respond to your request and reaffirm my commitment to abide my covenants. Any further communications I receive from clients will be directed back to HILB with no comments from me.
I await your direction concerning the emails you reference as well as any information can provide on the issue of my back commissions referenced above.


Sincerely,

Robert Vidal


Robert Vidal
Vice President, Employee Benefits
USI Insurance Services
261 Madison Avenue, 5th Floor
New York, NY 10016
Office 212-842-3423 | c: 718-926-5611
robert.vidal@usi.com | www.usi.com | in



**USI ONE ADVANTAGE** | Our Approach to Client Solutions. *Watch Video >*
**EXECUTIVE INSIGHTS** | Guidance on Top Issues from USI Experts. *Access Insights >*
**I'M WITH U** | Advancing Our Commitment to Diversity, Equity & Inclusion. *Learn More >*
**TOP INSURANCE EMPLOYER** | Multiple Industry Awards and Recognitions! *View Awards >*

*Please note that you may not rely on email communication to us to report a claim or to give us instructions to place, bind, change or terminate coverage unless we have subsequently confirmed to you in writing that we have received your message and will be taking the action you have requested.*

*Confidentiality Notice: The information contained in this email message including any attachments is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender by reply email and destroy all copies of the original message. Thank You.*

**From:** Robin White
**Sent:** Friday, January 20, 2023 11:50 AM
**To:** Robert Vidal
**Cc:** Andrew Sherrod
**Subject:** The Hilb Group of New York, LLC

> You don't often get email from rwhite@hirschlerlaw.com. Learn why this is important

Sent on behalf of Andrew P. Sherrod

**Robin M. White**
Professional Assistant
D: 804.771.5620
rwhite@hirschlerlaw.com

**Hirschler**
2100 East Cary Street | Richmond, VA 23223-7078
P: 804.771.9500 | F: 804.644.0957 | hirschlerlaw.com

Hirschler Fleischer, A Professional Corporation Confidentiality Note: This e-mail and any attachments are confidential and may be protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this e-mail or any attachment is prohibited. If you have received this e-mail in error, please notify us immediately by returning it to the sender and delete this copy from your system. Thank you for your cooperation.

This e-mail and any files transmitted with it may contain confidential and/or privileged material. This e-mail is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or have received this e-mail in error, please notify the sender by replying to the sender. After notifying the sender of the error, you should immediately delete this e-mail from your system. Please be aware that any unauthorized disclosure, dissemination, distribution, duplication or use of the e-mail contents or any attachments therein is strictly prohibited.

# Exhibit 5

| | |
|---|---|
| **From:** | Andrew Sherrod |
| **Sent:** | Saturday, March 18, 2023 5:36 PM |
| **To:** | 'Robert Brown' |
| **Subject:** | RE: The Hilb Group of New York, LLC |
| **Attachments:** | Litera Compare Redline - Vidal Affidavit-v1 and Vidal Affidav v2-v2.pdf; Murray Affidavit.3.8.23.pdf; 01-20-2023 LT Vidal.pdf; 15814125_1 Vidal Affidavit.DOCX |

Robert:

Your email below does not accurately portray our conversation or the emails that preceded it.

The "clean version" of the affidavit Mr. Vidal signed was the same revised document that he himself attached to his email to me on March 15, 2023 at 12:28pm. You were copied on that email, in which he introduced you as his attorney.

With Mr. Vidal now confirming that he was being represented by you, I forwarded Mr. Vidal's email, along with his attached revised affidavit, to you as his attorney on March 15, 2023 at 7:02pm. My email states that "I have done a comparison between the original affidavit I sent to Mr. Vidal and the revised version attached to his email today. A redline showing the changes is attached. These changes are troubling and require discussion. Please let me know your availability tomorrow and Friday for a call. In case you have not yet seen it, I am also attaching my initial letter to Mr. Vidal addressing my client's concerns regarding his pre-and post-departure activity."

As Mr. Vidal well knows, the "original affidavit" referenced in my email to you is the affidavit I sent to him via USI counsel Christopher Murray on February 21, 2023. In that same transmittal, I also sent Mr. Murray an affidavit for USI's signature, which Mr. Murray executed without revision. A copy of Mr. Murray's affidavit is attached for your reference.

When we spoke by telephone on March 16, I emphasized that my client was concerned by, and would not accept, the revisions that Mr. Vidal had made to the affidavit. Among other things, we discussed:

- Mr. Vidal had deleted paragraphs 4 and 5 from the original affidavit (as shown in the redline I sent to you on March 15 and attach again here). As explained in my letter to Mr. Vidal dated January 20, 2023 (a copy of which was also attached to my March 15 email to you and is attached again here), my client discovered at least four instances in which Mr. Vidal sent the company's confidential and proprietary business information from his company email account to his personal email account prior to his departure (see pages 2-3 of my January 20 letter describing those emails and their contents). There is nothing for Mr. Vidal to dispute regarding the accuracy of paragraphs 4 and 5 of the original affidavit.

- In addition, Mr. Vidal had revised in an unacceptable manner paragraph 7 of the original affidavit (paragraph 5 in his revised affidavit). Of particular concern was Mr. Vidal's insertion of language that excluded "the records concerning my compensation" from the Hilb Group information he was representing that he had deleted. When asked what Hilb Group information Mr. Vidal was retaining, you were unable to provide an answer. I emphasized to you the highly confidential nature of the materials that Mr. Vidal had forwarded to himself, including in particular a spreadsheet entitled "Bentson – Full BOB," which contains Bentson individual and group account names, along with information regarding the carrier, plan type, plan name, policy/group number, renewal date, and renewal status for many of the accounts. This spreadsheet is a trade secret document that Mr. Vidal had no right to send to himself and certainly has no right to keep. Mr. Vidal's revision to the original affidavit, especially in the absence of any explanation of what documents he considers "records related to his compensation," gives my client no assurance that Mr. Vidal does not still possess the confidential business information that he misappropriated.

- Lastly, Mr. Vidal deleted paragraph 11 of the original affidavit, in which he was to reaffirm his Confidentiality and Non-Solicitation Agreement, effective May 11, 2018, and promise to comply with its terms. Given his plain violation of the Agreement by forwarding my client's confidential information to his personal account, as well as the customer contacts described in my January 20 letter, Mr. Vidal's deletion of the reaffirmation of his commitment to comply with the Agreement is of great concern. Mr. Vidal previously stated, by email to me of January 26, 2023, that "I have consulted with USI counsel and been advised to respond to your request and reaffirm my commitment to abide my covenants." That Mr. Vidal would now omit the same commitment from the affidavit is an indication to my client that he no longer intends to honor his contractual obligations going forward.

Given our conversation and the emails preceding it, there should have been no doubt that the affidavit my client was requiring Mr. Vidal to sign "as is" was the original affidavit without his unacceptable revisions. Furthermore, there should be nothing for Mr. Vidal to dispute about the accuracy of the original affidavit, unless (1) he still possesses my client's confidential information (which appears to be the case given his revisions); or (2) he does not intend to honor the terms of the Agreement. Obviously neither of these scenarios would be acceptable.

While my client had grounds to file suit and seek injunctive relief and attorney fees immediately upon discovery of Mr. Vidal's misappropriation of its confidential business information, it instead gave Mr. Vidal a reasonable opportunity to avoid such action by taking the steps set forth in my January 20 letter. Among those steps was for Mr. Vidal to "submit a sworn affidavit confirming that (1) you have returned and/or deleted all of the Hilb Companies' information in your possession or control; and (2) you reaffirm and will abide by the terms of the Agreement going forward." The affidavit as revised by Mr. Vidal does neither of those things.

Please review with Mr. Vidal and return the original affidavit by Monday. I have attached the original affidavit again to this email. If Mr. Vidal would like to change the word "accepted" to "started" in paragraph 3, he is free to do so, but no other changes should be made without my client's approval. In the absence of an acceptable response, my client will be forced to proceed with legal action in order to protect its confidential and proprietary business information.

Andy

**From:** Robert Brown <rbrown@robertbrownlaw.com>
**Sent:** Friday, March 17, 2023 6:22 PM
**To:** Andrew Sherrod <ASherrod@hirschlerlaw.com>
**Subject:** [EXTERNAL] RE: The Hilb Group of New York, LLC

Your email to me on Wednesday said: "These changes are troubling and require discussion." We had a discussion. At no point did you ever say my client had to sign the affidavit "as-is" – especially since the clean version you emailed me incorporated my client's changes. My client was reluctant to sign an affidavit at all, but you convinced me that your client was concerned and wanted comfort and by providing the affidavit we would put this matter to rest. In good faith, my client signed the clean version of the affidavit that you emailed to me. He is unwilling to swear to the affidavit "as-is" because he disputes its accuracy. My client has signed an affidavit in which he swears:

4. I have not provided any Hilb Group Confidential Information to, nor have I shared any Hilb Group Confidential

Information with, any USI personnel or any other person, company or organization outside of the Company or THG.

5. I have deleted or destroyed all of the Hilb Group information in my possession other than the records concerning my compensation and I have retained no copies of Hilb Group information in any form.

6. I deleted the ████████████ E-Mail from my USI e-mail account, and I no longer have personal access to that e-mail. I am aware of no other Hilb Group Confidential Information in my USI account or on any of my USI devices.

7. I have not solicited any of my former Bentson customers to move their accounts to USI, and I am not aware of any of my former Bentson customers who have moved their accounts to USI.

8. I understand my ongoing obligations under the Agreement and have had those obligations explained to me by counsel for USI. Among other things, I have been instructed by USI that I may not speak with my former Bentson/THG clients about insurance during the covenant period set forth in the Agreement and that I must tell such clients to speak with Bentson/THG if they need to discuss insurance.


When I asked you yesterday what was to stop your client from suing mine after he signed the affidavit, you had no answer. If your client wants to proceed with litigation, then it was never negotiating in good faith in the first place and wanted to attach the disputed "as-is" version of the affidavit as an exhibit to the complaint.

Guide your actions accordingly.


Robert E. Brown, Esq.
Law Offices of Robert E. Brown, PC

14 Wall Street, 20th Floor
New York, NY 10005

260 Christopher Lane- Suite 201
Staten Island, NY 10314

Telephone numbers
Wall Street (212) 766-9779
Staten Island (718) 979-9779
Facsimile (718) 979-9784

www.RobertBrownLaw.com


**From:** Andrew Sherrod <ASherrod@hirschlerlaw.com>
**Sent:** Friday, March 17, 2023 4:49 PM
**To:** Robert Brown <rbrown@robertbrownlaw.com>
**Subject:** RE: The Hilb Group of New York, LLC

Robert,

I don't see how you or Mr. Vidal could have had such an understanding, since I also attached to the email you referenced a redline document showing the changes that Mr. Vidal had made to the original affidavit previously sent to him and then we discussed those unacceptable changes on our call yesterday. In any event, my email below stands. Please discuss with Mr. Vidal and return the signed original affidavit on Monday. Thank you.
Andy

**From:** Robert Brown <rbrown@robertbrownlaw.com>
**Sent:** Friday, March 17, 2023 4:40 PM
**To:** Andrew Sherrod <ASherrod@hirschlerlaw.com>
**Subject:** [EXTERNAL] RE: The Hilb Group of New York, LLC

My client signed the only clean version of the affidavit that was attached to the email you sent me on Wednesday, March 15, 2023 at 7:02 PM. It was my understanding that was the version you were requesting him to sign.

Robert E. Brown, Esq.
Law Offices of Robert E. Brown, PC

14 Wall Street, 20th Floor
New York, NY 10005

260 Christopher Lane- Suite 201
Staten Island, NY 10314

Telephone numbers
Wall Street (212) 766-9779
Staten Island (718) 979-9779
Facsimile (718) 979-9784

www.RobertBrownLaw.com

**From:** Andrew Sherrod <ASherrod@hirschlerlaw.com>
**Sent:** Friday, March 17, 2023 4:34 PM
**To:** Robert Brown <rbrown@robertbrownlaw.com>
**Subject:** FW: The Hilb Group of New York, LLC

Robert:
The affidavit that Mr. Vidal has signed is the affidavit with his revisions. As we discussed at length yesterday, Mr. Vidal's revisions are simply not acceptable to Hilb. My understanding of your email yesterday, stating that Mr. Vidal would sign the affidavit "as is," was that Mr. Vidal would be signing the original affidavit that Hilb provided for his signature (copy attached) without his unacceptable revisions. That original affidavit is the affidavit that Mr. Vidal must sign if he wishes to avoid litigation. If this was simply a mistake, we will allow until Monday for Mr. Vidal to return the original affidavit. If not, please confirm, and we will proceed with legal action in order to protect Hilb's interests in its confidential and proprietary business information.
Andy

**From:** Robert Brown <rbrown@robertbrownlaw.com>
**Sent:** Friday, March 17, 2023 3:28 PM
**To:** Andrew Sherrod <ASherrod@hirschlerlaw.com>
**Subject:** [EXTERNAL] RE: The Hilb Group of New York, LLC

Attached please find the affidavit. If you have any questions or concerns, please let me know.

4

Robert E. Brown, Esq.
Law Offices of Robert E. Brown, PC

14 Wall Street, 20th Floor
New York, NY 10005

260 Christopher Lane- Suite 201
Staten Island, NY 10314

Telephone numbers
Wall Street (212) 766-9779
Staten Island (718) 979-9779
Facsimile (718) 979-9784

www.RobertBrownLaw.com

**From:** Andrew Sherrod <ASherrod@hirschlerlaw.com>
**Sent:** Thursday, March 16, 2023 4:39 PM
**To:** Robert Brown <rbrown@robertbrownlaw.com>
**Subject:** RE: The Hilb Group of New York, LLC

Thank you. I look forward to receiving it.

**From:** Robert Brown <rbrown@robertbrownlaw.com>
**Sent:** Thursday, March 16, 2023 4:12 PM
**To:** Andrew Sherrod <ASherrod@hirschlerlaw.com>
**Subject:** [EXTERNAL] RE: The Hilb Group of New York, LLC

My client is going to sign the affidavit as is and we will provide you with a notarized copy by tomorrow.

Robert E. Brown, Esq.
Law Offices of Robert E. Brown, PC

14 Wall Street, 20th Floor
New York, NY 10005

260 Christopher Lane- Suite 201
Staten Island, NY 10314

Telephone numbers
Wall Street (212) 766-9779
Staten Island (718) 979-9779
Facsimile (718) 979-9784

www.RobertBrownLaw.com

**From:** Andrew Sherrod <ASherrod@hirschlerlaw.com>
**Sent:** Wednesday, March 15, 2023 7:02 PM

**To:** Robert Brown <rbrown@robertbrownlaw.com>
**Subject:** FW: The Hilb Group of New York, LLC

Mr. Brown,

I understand from Mr. Vidal's email below that you are representing him in this matter.

I have done a comparison between the original affidavit I sent to Mr. Vidal and the revised version attached to his email today. A redline showing the changes is attached. These changes are troubling and require discussion. Please let me know your availability tomorrow and Friday for a call. In case you have not yet seen it, I am also attaching my initial letter to Mr. Vidal addressing my client's concerns regarding his pre-and post-departure activity. I look forward to speaking with you soon.

Andy Sherrod

**From:** Robert Vidal <robert.vidal@usi.com>
**Sent:** Wednesday, March 15, 2023 12:28 PM
**To:** Andrew Sherrod <ASherrod@hirschlerlaw.com>; Christopher Murray <Christopher.Murray@usi.com>
**Cc:** rbrown@robertbrownlaw.com
**Subject:** [EXTERNAL] RE: The Hilb Group of New York, LLC

Hi, I'm still unclear why this affidavit is needed. You already have a signed non complete.

I have copied my attorney and at this point we can remove the USI counsel.

Robert Vidal
Vice President, Employee Benefits
USI Insurance Services
261 Madison Avenue, 5th Floor
New York, NY 10016
Office 212-842-3423 | c: 718-926-5611
robert.vidal@usi.com | www.usi.com | 



**USI ONE ADVANTAGE®** | Our Approach to Client Solutions. *Watch Video >*
**EXECUTIVE INSIGHTS** | Guidance on Top Issues from USI Experts. *Access Insights >*
**I'M WITH U** | Advancing Our Commitment to Diversity, Equity & Inclusion. *Learn More >*
**TOP INSURANCE EMPLOYER** | Multiple Industry Awards and Recognitions! *View Awards >*

Please note that you may not rely on email communication to us to report a claim or to give us instructions to place, bind, change or terminate coverage unless we have subsequently confirmed to you in writing that we have received your message and will be taking the action you have requested.

Confidentiality Notice: The information contained in this email message including any attachments is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender by reply email and destroy all copies of the original message. Thank You.

**From:** Andrew Sherrod <ASherrod@hirschlerlaw.com>
**Sent:** Wednesday, March 15, 2023 12:10 PM
**To:** Christopher Murray <Christopher.Murray@usi.com>
**Cc:** Robert Vidal <robert.vidal@usi.com>
**Subject:** RE: The Hilb Group of New York, LLC
**Importance:** High

You don't often get email from asherrod@hirschlerlaw.com. Learn why this is important

Robert,

I am following up on the message below. Please provide (or have your counsel provide if you are represented) the signed affidavit or any proposed revisions no later than COB on Friday, March 17. Thank you.

**From:** Andrew Sherrod <ASherrod@hirschlerlaw.com>
**Sent:** Monday, March 13, 2023 1:24 PM
**To:** 'Christopher Murray' <Christopher.Murray@usi.com>
**Cc:** Robert Vidal <robert.vidal@usi.com>
**Subject:** RE: The Hilb Group of New York, LLC

Thank you, Chris.

Robert, we look forward to hearing from you (or your counsel if you are represented) regarding the affidavit as soon as possible.

**Andrew P. Sherrod**
D: 804.771.9575
asherrod@hirschlerlaw.com

**Hirschler**
2100 East Cary Street | Richmond, VA 23223-7078
P: 804.771.9500 | F: 804.644.0957 | hirschlerlaw.com
Hirschler Fleischer, A Professional Corporation Confidentiality Note: This e-mail and any attachments are confidential and may be protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this e-mail or any attachment is prohibited. If you have received this e-mail in error, please notify us immediately by returning it to the sender and delete this copy from your system. Thank you for your cooperation.

**From:** Christopher Murray <Christopher.Murray@usi.com>
**Sent:** Friday, March 10, 2023 4:25 PM
**To:** Andrew Sherrod <ASherrod@hirschlerlaw.com>
**Cc:** Robert Vidal <robert.vidal@usi.com>
**Subject:** [EXTERNAL] RE: The Hilb Group of New York, LLC

Andrew,

I am copying Robert on this response. Robert is consulting with his personal counsel and he or counsel will be responding concerning his affidavit.

Thanks

Chris

**From:** Andrew Sherrod <ASherrod@hirschlerlaw.com>
**Sent:** Thursday, March 9, 2023 11:40 AM
**To:** Christopher Murray <Christopher.Murray@usi.com>
**Subject:** RE: The Hilb Group of New York, LLC

Thanks, Chris. I look forward to hearing from you soon.

**From:** Christopher Murray <Christopher.Murray@usi.com>
**Sent:** Wednesday, March 8, 2023 3:24 PM
**To:** Andrew Sherrod <ASherrod@hirschlerlaw.com>
**Subject:** [EXTERNAL] RE: The Hilb Group of New York, LLC

7

Andrew,

Sorry for the delay. Attached is my affidavit. Robert – had some concerns about the affidavit. I made some revisions and he is still reviewing. His concerns really are outside the scope of his USI employment, so I may have him deal directly with you. I will get back to you shortly.

Thanks
Chris

This e-mail and any files transmitted with it may contain confidential and/or privileged material. This e-mail is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or have received this e-mail in error, please notify the sender by replying to the sender. After notifying the sender of the error, you should immediately delete this e-mail from your system. Please be aware that any unauthorized disclosure, dissemination, distribution, duplication or use of the e-mail contents or any attachments therein is strictly prohibited.

This e-mail and any files transmitted with it may contain confidential and/or privileged material. This e-mail is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient or have received this e-mail in error, please notify the sender by replying to the sender. After notifying the sender of the error, you should immediately delete this e-mail from your system. Please be aware that any unauthorized disclosure, dissemination, distribution, duplication or use of the e-mail contents or any attachments therein is strictly prohibited.

## <u>AFFIDAVIT OF ROBERT VIDAL</u>

I, Robert Vidal, being duly sworn, declare under penalty of perjury that the following is true and correct:

1.      I am a former employee of The Hilb Group of New York, LLC, d/b/a Bentson Insurance Group ("Bentson" or the "Company"). I understand that the Company is a subsidiary of The Hilb Group, LLC ("THG"). I resigned my employment with the Company on or about November 18, 2022.

2.      In connection with my employment with the Company, I executed a Confidentiality and Non-Solicitation Agreement, effective May 11, 2018 (the "Agreement").

3.      Following my departure from the Company, I accepted a position with, and am currently employed by, USI Insurance Services ("USI"), a competitor of the Company and THG.

4.      During my employment with the Company, I e-mailed to my personal account certain confidential customer and business information belonging to the Company and/or THG (collectively, the "Hilb Group Confidential Information").

5.      On November 17, 2022, I forwarded to both my personal email account and my new USI email account an email with attachments related to Bentson client ███████████ ████████ which included information regarding the client's plans and renewal options (the ███████████ E-Mail").

6.      I have not provided any Hilb Group Confidential Information to, nor have I shared any Hilb Group Confidential Information with, any USI personnel or any other person, company or organization outside of the Company or THG.

1

7.      I have deleted or destroyed all of the Hilb Group Confidential Information in my possession, including all Hilb Group Confidential Information contained in e-mails on my personal account, and I have retained no copies in any form.

8.      I deleted the ███████████ E-Mail from my USI e-mail account, and I no longer have personal access to that e-mail.  I am aware of no other Hilb Group Confidential Information in my USI account or on any of my USI devices.

9.      I have not solicited any of my former Bentson customers to move their accounts to USI, and I am not aware of any of my former Bentson customers who have moved their accounts to USI.

10.      I understand my ongoing obligations under the Agreement and have had those obligations explained to me by counsel for USI.  Among other things, I have been instructed by USI that I may not speak with my former Bentson/THG clients about insurance during the covenant period set forth in the Agreement and that I must tell such clients to speak with Bentson/THG if they need to discuss insurance.

11.      I hereby affirm the Agreement and promise to comply with its terms.


*[Remainder of page intentionally left blank.  Signature page follows.]*

2

_____
Robert Vidal

STATE OF _____        )
                            ) To wit:
CITY OF _____  )

The foregoing was acknowledged before me on this __ day of February, 2023, by Robert

Vidal.

_____
Notary Public

My commission expires:    _____

15814125.1 041373.00001

3

## AFFIDAVIT OF ROBERT VIDAL

I, Robert Vidal, being duly sworn, declare under penalty of perjury that the following is true and correct:

1.      I am a former employee of The Hilb Group of New York, LLC, d/b/a Bentson Insurance Group ("Bentson" or the "Company"). I understand that the Company is a subsidiary of The Hilb Group, LLC ("THG"). I resigned my employment with the Company on or about November 18, 2022.

2.      In connection with my employment with the Company, I executed a Confidentiality and Non-Solicitation Agreement, effective May 11, 2018 (the "Agreement").

3.      Following my departure from the Company, I ~~accepted~~started a position with, and am currently employed by, USI Insurance Services ("USI"), a competitor of the Company and THG.

4.      ~~During my employment with the Company, I e-mailed to my personal account certain confidential customer and business information belonging to the Company and/or THG (collectively, the "Hilb Group Confidential Information").~~

5.      ~~On November 17, 2022, I forwarded to both my personal email account and my new USI email account an email with attachments related to Bentson client~~ █████████ ~~Concepts, which included information regarding the client's plans and renewal options (the~~ ███████████ ~~E-Mail").~~

~~6~~4.      I have not provided any Hilb Group Confidential Information to, nor have I shared any Hilb Group Confidential Information with, any USI personnel or any other person, company or organization outside of the Company or THG.

1

7~~5~~5.    I have deleted or destroyed all of the Hilb Group ~~Confidential Information~~information in my possession~~, including all Hilb Group Confidential Information contained in e-mails on my personal account,~~ other than the records concerning my compensation and I have retained no copies of Hilb Group information in any form.

8~~6~~6.    I deleted the ████████████ E-Mail from my USI e-mail account, and I no longer have personal access to that e-mail.  I am aware of no other Hilb Group Confidential Information in my USI account or on any of my USI devices.

9~~7~~7.    I have not solicited any of my former Bentson customers to move their accounts to USI, and I am not aware of any of my former Bentson customers who have moved their accounts to USI.

10~~8~~8.    I understand my ongoing obligations under the Agreement and have had those obligations explained to me by counsel for USI.  Among other things, I have been instructed by USI that I may not speak with my former Bentson/THG clients about insurance during the covenant period set forth in the Agreement and that I must tell such clients to speak with Bentson/THG if they need to discuss insurance.

11.    ~~I hereby affirm the Agreement and promise to comply with its terms.~~

*[Remainder of page intentionally left blank.  Signature page follows.]*

2

_____
Robert Vidal

STATE OF _____          )
                             ) To wit:
CITY OF _____    )

    The foregoing was acknowledged before me on this __ day of ~~February~~March, 2023, by Robert Vidal.

_____
Notary Public

My commission expires:    _____

~~15814125.1~~ 15814125.2  041373.00001

| **Summary report:** <br> **Litera Compare for Word 11.3.0.46 Document comparison done on 3/15/2023 1:34:48 PM** | |
|---|---|
| **Style name:** HF Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://HF_IMAN/IMAN/15814125/1 | |
| **Modified DMS:** iw://HF_IMAN/IMAN/15814125/2 | |
| **Changes:** | |
| Add | 11 |
| Delete | 13 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 24 |

## AFFIDAVIT OF CHRISTOPHER MURRAY

I, Christopher Murray, being duly sworn, declare under penalty of perjury that the following is true and correct:

1.      I am, and at all times relevant have been, Vice President and Assistant General Counsel for USI Insurance Services ("USI").

2.      I am in receipt of Andrew Sherrod's letter of January 20, 2023, to USI's Senior Vice President and General Counsel, Ernest J. Newborn, II, regarding Robert Vidal, a former employee of The Hilb Group of New York, LLC, d/b/a Bentson Insurance Group ("Bentson" or the "Company") who is now employed by USI. I understand that the Company is a subsidiary of The Hilb Group, LLC ("THG").

3.      Enclosed with the above-referenced letter was a copy of a Confidentiality and Non-Solicitation Agreement, effective May 11, 2018, between Mr. Vidal and the Company (the "Agreement").

4.      I have discussed the Agreement with Mr. Vidal and have instructed him on behalf of USI that he must abide by the terms of the Agreement. Among other things, Mr. Vidal has been instructed that he may not speak with his former Bentson/THG clients about insurance during the covenant period set forth in the Agreement and that he must tell such clients to speak with Bentson/THG if they need to discuss insurance.

5.      I searched Mr. Vidal's USI email account and found no emails from his Bentson email account or his personal email account. I have been informed that Mr. Vidal deleted an email with attachments that he sent on November 17, 2022, from his Bentson email account to his USI email account. While that deleted email remains archived on USI's server, neither Mr. Vidal nor anyone else in his business unit has access to that email.

1

Christopher Murray

STATE OF NY _____ )
                        ) To wit:
CITY OF Westchester ___ )

The foregoing was acknowledged before me on this 8th ~~day~~ of ~~February~~ March, 2023, by

Christopher Murray.

Notary Public

My commission expires: December 8, 2025

15814511.1 041373.00001

GLORIA I. BISOGNO
Notary Public, State of New York
Registration #02BI6316028
Qualified In Westchester County
Commission Expires December 8, 2025

2

# Hirschler

Andrew P. Sherrod
D. 804 771 5575
asherrod@hirschlerlaw.com

Hirschler Fleischer | hirschlerlaw.com
2100 East Cary Street | Richmond, VA 23223
P. 804 771 9500 | F. 804 644 0957

January 20, 2023

**VIA E-MAIL & OVERNIGHT DELIVERY**

Robert Vidal
USI Insurance Services
261 Madison Avenue, 5th Floor
New York, New York 10016
robert.vidal@usi.com

Dear Mr. Vidal:

     Re:    **The Hilb Group of New York, LLC**

    My firm represents The Hilb Group, LLC ("THG") and its subsidiary, The Hilb Group of New York, LLC, d/b/a Bentson Insurance Group ("Bentson" or the "Company"), your former employer. Please review this letter with care, as you must stringently adhere to my clients' instructions in order to avoid litigation.

    My clients understand that, following your departure from Bentson on or about November 18, 2022, you have begun employment as a Vice President for Employee Benefits at USI Insurance Services ("USI"), a direct competitor of THG and Bentson. In light of your new employment with USI, it is important to emphasize your continuing obligations to Bentson and THG under your Confidentiality and Non-Solicitation Agreement dated May 11, 2018 (the "Agreement"), a copy of which in enclosed. You must strictly comply with the terms of the Agreement to avoid potential liability for both yourself and USI. Unfortunately, information obtained by my clients suggests that you have not done so.

    Regarding customers and prospects, the Agreement requires that, for a period of two years following the termination of your employment with Bentson, you will not, among other things, directly or indirectly: (a) "solicit to provide, sell or provide Competitive Services to . . . or induce the termination, cancellation or non-renewal of any Hilb Company's business relationship with, any Hilb Company client whose Client Account [you] managed or regularly serviced . . ."; or (b) "solicit to provide, sell or provide Competitive Services to . . . any Active Prospective Client that [you] solicited to provide Competitive Services on behalf of the Hilb Companies . . . and/or about which [you] obtained Confidential Information and/or Trade Secrets during and by virtue of [your] employment with the Hilb Companies . . . ." The terms "Competitive Services," "Client Account," "Active Prospective Client," "Confidential Information," and "Trade Secrets" are all defined clearly in the Agreement.

The Agreement also provides that, for a period of two years following the termination of your employment with Bentson, you will not, directly or indirectly, solicit, hire or engage any employee or independent contractor of THG or any of its affiliated companies (the "Hilb Companies"), nor shall you induce any individual to leave or reduce his or her employment or engagement with any of the Hilb Companies.

During your employment with Bentson, you also had access to and were provided confidential business information and trade secrets of THG, Bentson, and other Hilb Companies. The Agreement provides that you will not use or disclose any Confidential Information of the Hilb Companies to any other person or entity unless and until such information becomes public through no fault of your own, or unless you are compelled, required, or protected by law to make such disclosure.

As you know, THG and Bentson have invested significant time and resources into developing relationships with their customers, prospects, and employees, as well as into creating and safeguarding the companies' confidential business information and trade secrets. The covenants set forth in the Agreement are narrowly tailored to protect those legitimate business interests, and the Company expects that you will honor your obligations to uphold those interests under the Agreement and applicable law.

On or about November 29, 2022, my clients became aware that their client ███████████ an account you handled while employed at Bentson, copied you on email correspondence regarding its account via your new USI e-mail address. Subsequently, Jim Butler, CEO of USI's Northeast Region, contacted Robert Bentson regarding several accounts that you would like to bring over to USI—namely, ███████████████████████ Please note that the terms of the Agreement would forbid you from soliciting or accepting competitive business from these accounts for the two-year covenant period following your departure from Bentson.

To my clients' dismay, while they were considering your request related to the accounts referenced above, on or about January 17, 2023, another account you previously serviced, ████████████ contacted Bentson and informed its representative that you had been *in regular contact with them several times this month* about their insurance needs – on behalf of USI. As ████████████ was not among the accounts you asked my clients to consider, they are understandably concerned that you are actively soliciting your former accounts in violation of the Agreement.

Even more disturbingly, my clients have just discovered that in the days leading up to your departure from Bentson, you sent highly confidential business and customer information of Bentson to your personal email address. While their investigation is on-going, to date my clients have discovered at least four instances in which you sent the Company's confidential and proprietary business information to your personal email account:

January 20, 2023
Page 3

- On November 2, 2022, you sent a spreadsheet from your Bentson email address to your personal email address (Robvidal@yahoo.com) that contains a list of carriers, along with their website portal addresses and username/password information for those sites.
- Also on November 2, 2022, you sent from your Bentson email address to your personal email address a Commission Payable Statement, dated September 30, 2022, setting forth a list of Company accounts, along with corresponding policy numbers, effective dates, and information detailing the calculation of your commissions on the listed accounts.
- On November 8, 2022, you forwarded an e-mail string from your Bentson email address to your personal email address. That string, between yourself and several other Company employees, concerned transitioning the Bentson book of business to others within the Company following your departure. As part of that string, you were provided a spreadsheet entitled "Bentson – Full BOB," which contains Bentson individual and group account names, along with information regarding the carrier, plan type, plan name, policy/group number, renewal date, and renewal status for many of the accounts.
- On November 17, 2022, the day before your departure from Bentson, you forwarded from your Bentson email address to both your personal email account *and* your new USI email address an email with attachments related to Bentson client ████████ which included information regarding the client's plans and renewal options.

Please be advised that THG and Bentson consider the foregoing items to be Confidential Information under the Agreement, which you are not permitted to use or disclose. Furthermore, my clients contends that certain of that information—for example, the "Bentson – Full BOB" spreadsheet—rises to the level of a trade secret protected from misappropriation under applicable state law and the federal Defend Trade Secrets Act.

Given your actions, my clients are not inclined to agree to your request to discuss transitioning the referenced accounts prior to the expiration of the restrictive covenant period set forth in the Agreement. Instead, please consider this letter as notice that THG and Bentson expect strict compliance with all of your obligations under the Agreement.

Furthermore, for good reason, my clients are concerned that you will, if you have not done so already, further violate both your legal and contractual duties to THG and the Company by disclosing their confidential business and customer information to USI or by using it to solicit business from your former accounts for the benefit of USI. As a result, THG and Bentson stand prepared to take appropriate legal action necessary to enforce their rights and to seek the full measure of remedies to which the Company is entitled. If you wish to avoid such action, you must, within seven (7) days of this letter, proceed as follows:

- Disclose the names of any customers or prospective customers covered under Section 2.1 of the Agreement that you have contacted since leaving Bentson.

January 20, 2023
Page 4

- Identify all devices or servers on which you have stored or copied the above-referenced emails, the information contained in those emails, and/or any other Confidential Information of Bentson, THG, or any of the other Hilb Companies.
- Identify any individuals outside of Bentson, THG, or any of the other Hilb Companies to whom you have disclosed any information contained in the above-referenced emails and/or any other Confidential Information of Bentson, THG, or any of the other Hilb Companies— specifically including but not limited to any USI personnel to whom you have disclosed such information.
- To the extent that any of the foregoing information has been placed on USI devices or servers or otherwise disclosed to USI personnel, immediately quarantine such information so that it cannot be used by anyone at USI.
- Allow a Company representative or consultant to supervise and coordinate the deletion of any Confidential Information from your home computer(s), personal e-mail account, USI email account or devices, and any other electronic devices or media on which such information is stored.
- After the completion of the foregoing procedures, submit a sworn affidavit confirming that (1) you have returned and/or deleted all of the Hilb Companies' information in your possession or control; and (2) you reaffirm and will abide by the terms of the Agreement going forward.

We look forward to your prompt response. Pending resolution of this matter, my clients reserve all rights and waive none.

Sincerely,

Andrew P. Sherrod

APS/rw
Enclosure
cc:     VIA OVERNIGHT DELIVERY
        Ernest J. Newborn, II, Esquire
        Senior Vice President & General Counsel
        USI Insurance Services
        100 Summit Lake Drive, Suite 400
        Valhalla, New York 10595

EXECUTION VERSION

## CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

This CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT (this "**Agreement**") is effective as of May 11, 2018 (the "**Effective Date**"), by and between The Hilb Group of New York, LLC, a Delaware limited liability company (the "**Company**"), and Robert Vidal ("**Employee**"). The Company and Employee are collectively referred to hereinafter as the "**Parties**."

R E C I T A L S:

WHEREAS, the Company, Allen C. Bentson Agency, Inc. d/b/a Bentson Insurance Group, a New York corporation, Robert P. Bentson, Allen C. Bentson, Jr. and Donald Bentson, the owners of Seller, have entered into that certain Asset Purchase Agreement, effective as of the date hereof (the "**Purchase Agreement**");

WHEREAS, prior to the closing of the Purchase Agreement, Employee provided services for compensation to Seller;

WHEREAS, the Company is an indirect wholly owned subsidiary of The Hilb Group, LLC, a Delaware limited liability company ("**THG**");

WHEREAS, Employee is or desires to become an employee of the Company, and by virtue of such employment, Employee has and/or will have access to and be given Confidential Information of THG and its affiliated companies (each, a "**Hilb Company**," and together, the "**Hilb Companies**"), including Trade Secrets of the Hilb Companies;

WHEREAS, Employee acknowledges and agrees that the Company has a reasonable, necessary and legitimate business interest in protecting its own and the Hilb Companies' Trade Secrets and Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill and ongoing business, and that the terms and conditions herein are reasonable and necessary to protect these legitimate business interests; and

WHEREAS, Seller and the Company are parties to that certain Transition Services Agreement, dated as of the date hereof (the "**TSA**"), whereby Seller are delivering various services to the Company through Seller' employees, including Employee. Employee will temporarily continue to be an employee of Seller pursuant to the TSA, until such services requiring Employee to perform services for Seller are terminated (the "**Interim Period**"). During the Interim Period, Employee will receive all compensation and benefits from Seller, consistent with past practices of Seller.

NOW THEREFORE, in consideration of Employee's employment with the Company, and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the Parties, intending to become legally bound, agree as follows:

1. **CONFIDENTIALITY.** The Hilb Companies may provide Employee with Confidential Information, including Trade Secrets of the Hilb Companies, to assist Employee in the course and scope of Employee's duties. Employee acknowledges that the Hilb Companies' willingness to provide Confidential Information and Trade Secrets to Employee is in consideration for, and ancillary to, Employee's agreement to the other terms set forth in this Agreement, including the restrictive covenants set forth below. Employee further acknowledges and agrees that the Hilb Companies have a reasonable, necessary and legitimate business interest in protecting their Confidential Information, and that the terms and conditions of this Section 1 are reasonable and necessary to protect these legitimate business interests. All Confidential Information of the Hilb Companies, which Employee has access to, receives or generates during the

course of Employee's employment with the Company, shall be the sole property of the relevant Hilb Company and shall remain with the relevant Hilb Company upon termination of Employee's employment. Employee will not use or disclose any Confidential Information, except (a) in the normal course of business on behalf of the Company or (b) to the extent necessary to comply with law or the valid order of a court of competent jurisdiction or to truthfully cooperate with any governmental or administrative agency or entity in any investigation or inquiry. In addition, Employee will use reasonable efforts to prevent any such prohibited use or disclosure by any other person.

2.    **NON-SOLICITATION AND NON-INTERFERENCE.**    During the Interim Period, Employee's actions performed as an employee of Seller on behalf of the Company, pursuant to the TSA, shall not be restricted by these restrictive covenants below, as such restrictive covenants would otherwise prohibit Employee's actions performed as an employee of Seller.

2.1.    *Non-Solicitation.*    Employee shall not, without the Company's prior written consent, directly or indirectly: (a) solicit to provide, sell or provide Competitive Services to, consult regarding the provision of Competitive Services for, sign or accept a broker of record letter concerning Competitive Services with, or induce the termination, cancellation or non-renewal of any Hilb Company's business relationship with, any Hilb Company client whose Client Account Employee managed or regularly serviced on behalf of the Hilb Companies, Seller or its affiliates, successors or assigns, and/or about which Employee obtained Confidential Information and/or Trade Secrets on behalf of the Hilb Companies, Seller or its affiliates, successors or assigns during and by virtue of Employee's employment with the Hilb Companies, Seller or its affiliates, successors or assigns, in each case, at any time during the 18 months prior to the date of the termination of Employee's employment, for any or no reason, with the Hilb Companies and their affiliates, successors and assigns (the "**Employment Cessation Date**"); and/or (b) solicit to provide, sell or provide Competitive Services to, consult regarding the provision of Competitive Services for, or sign or accept a broker of record letter concerning Competitive Services with, any Active Prospective Client that Employee solicited to provide Competitive Services on behalf of the Hilb Companies, Seller or its affiliates, successors and assigns and/or about which Employee obtained Confidential Information and/or Trade Secrets during and by virtue of Employee's employment with the Hilb Companies, Seller or its affiliates, successors and assigns, in each case, at any time during the six months prior to the Employment Cessation Date. These restrictions shall apply during Employee's employment by the Hilb Companies and their affiliates, successors or assigns and for the two years immediately following the Employment Cessation Date. Notwithstanding anything to the contrary contained herein, the Parties acknowledge and agree that this Section 2.1 does not prohibit and shall not be construed as prohibiting Employee from soliciting to provide, selling or providing any products or services other than Competitive Services or from engaging in any activities that do not compete with the business conducted by the Hilb Companies during Employee's employment by the Hilb Companies and their affiliates, successors or assigns. Employee acknowledges and agrees that the Trade Secrets constitute trade secrets of the Hilb Companies, and that the Hilb Companies have a reasonable, necessary and legitimate business interest in protecting their Trade Secrets, and that the terms and conditions of this non-solicitation provision are reasonable and necessary to protect such Trade Secrets.

2.2.    *Non-Interference.*    Employee shall not, directly or indirectly: (a) solicit the employment, consulting or other services of, or hire or engage, any employee or individual independent contractor of any Hilb Company or (b) otherwise induce any individual to leave or reduce his or her employment or engagement or to breach an employment agreement therewith. These restrictions shall apply during Employee's employment by the Hilb Companies or their affiliates, successors or assigns and for the two years immediately following the Employment Cessation Date. An employee shall be deemed covered by this Section 2.2 while so employed and for a period of one year thereafter.

3.    **MODIFICATION.**    If a court finds that any provision of this Agreement exceeds the time,

geographic or scope limitations permitted by applicable law, the restrictions shall be reformed to the maximum time, geographic or scope limitations permissible. If a court refuses to enforce any term of these provisions, then the unenforceable terms shall be eliminated, blue penciled or otherwise modified by the court to the extent necessary to permit the remaining terms to be enforced to the fullest extent permitted by applicable law.

4.    **INDEPENDENT ENFORCEMENT.**    Each of the covenants in this Agreement shall be construed as an agreement independent of (a) any other agreements between Employee and any of the Hilb Companies and (b) any other provision in this Agreement, and the existence of any claim or cause of action by Employee against any of the Hilb Companies, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Employee or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of any of the covenants set forth in Sections 1 and 2 of this Agreement by reason of any breach of (i) any other part of this Agreement or (ii) any other agreement between Employee and any of the Hilb Companies.

5.    **EMPLOYEE'S REPRESENTATIONS AND WARRANTIES.**    Employee represents and warrants to the Company that, except as such actions relate to Seller as the "prior employer": (a) Employee has previously supplied to the Company all agreements between Employee and any entity which has employed Employee in the last five years, and that Employee's execution of this Agreement and the performance of Employee's duties for the Company do not conflict with, and are not impaired by, any law, rule, regulation, court order or agreement by which Employee is bound; (b) Employee has not removed from any prior employer any non-public, confidential, proprietary and/or trade secret information, and that Employee has no such non-public, confidential, proprietary and/or trade secret information in Employee's possession or control in any form including electronic media, and that Employee will not use any such non-public, confidential, proprietary and/or trade secret information in the performance of Employee's duties for the Company; (c) Employee has not taken any copyrighted materials from any prior employer, that Employee has no such copyrighted materials in Employee's possession, and that Employee will not use any such copyrighted materials in the performance of Employee's duties for the Company; (d) except as disclosed in the attached Exhibit A, Employee is not and has not been subject to the provisions of any sales and purchase agreement entered into within the past five years with any organization, individual or business entity which prevents or restricts Employee from competing with, or soliciting the clients, customers, business or employees (including, without limitation, for the purposes of hiring such employees) of, such other organization, individual or business entity for any period of time or within any geographical area, whether heretofore expired or not; (e) Employee has not made any contact with any clients of any former employer concerning Employee's prospective employment relationship and/or Employee's employment relationship with the Company, and that Employee will not, without the prior express direction of the Company's Chief Executive Officer or THG Board of Directors, solicit any clients of any former employer; (f) Employee has not and shall not make any contact with any employees of any former employer concerning their prospective employment relationship with the Company, without the prior express direction of the Company's Chief Executive Officer or THG Board of Directors; and (g) Employee has no ownership rights to any Client Accounts, including, but not limited to, any client accounts of Seller prior to the Closing.

6.    **REMEDY.**    Employee acknowledges that the services to be rendered by Employee are of a special, unique and extraordinary character and that it would be extremely difficult or impracticable to replace such services, that the material provisions of this Agreement are of crucial importance to the Hilb Companies, and that any damage caused by the breach of Sections 1 and/or 2 of this Agreement would result in irreparable harm to the business of the Hilb Companies for which money damages alone would not be adequate compensation. Accordingly, upon such breach by Employee, the Company (or any other Hilb Company) shall, in addition to any other rights or remedies of the Company (or any other Hilb

Company) available at law, be entitled to, without posting a bond or proving irreparable harm or injury, equitable relief in any court of competent jurisdiction, including, without limitation, temporary and permanent injunction.

7.     **AT-WILL EMPLOYMENT.** Employee acknowledges and agrees that this Agreement shall not be construed or considered in any manner to affect any aspect of Employee's at-will employment by the Company, meaning the Company or Employee may terminate Employee's employment for any reason or no reason, with or without advance notice. This Agreement does not constitute a contract of employment for a definite term.

8.     **ENTIRE AGREEMENT; NO AMENDMENT; GOVERNING LAW.** This Agreement represents the entire Agreement between the Parties concerning the specific subject matter hereof, and supersedes any prior agreement between the Parties concerning the specific subject matter hereof. No amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by Employee and an authorized representative of the Company. This Agreement shall be construed by and governed in accordance with the laws of the State of Delaware without regard to principles of conflicts of law.

9.     **SEVERABILITY.** The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render it valid, legal and enforceable to the fullest extent permitted by law. It is expressly understood and agreed between Employee and the Company that such modification or restriction may be accomplished by mutual accord between the Parties or, alternatively, by disposition of a court of law. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

10.     **ASSIGNMENT.** Employee may not assign any rights under this Agreement without the prior written consent of the Company. Employee's obligations under this Agreement inure to the Company, its successors and assigns. The Company may, at any time and without Employee's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor with which Employee may become employed. Any such successor or assign is expressly authorized to enforce the terms of this Agreement.

11.     **DEFEND TRADE SECRETS ACT NOTICE.** An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret if: (a) the disclosure of the trade secret is made in confidence to a government official, either directly or indirectly, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law; (b) the disclosure of the trade secret is made in a complaint or other document filed in a lawsuit, if such filing is made under seal; or (c) if an individual files a lawsuit alleging retaliation by an employer for reporting a suspected violation of law, if the disclosure of the trade secret is made to the attorney of the individual or used in the court proceeding so long as the filing of any document containing the trade secret is under seal and the trade secret is not disclosed except under court order.

12.     **DEFINITIONS.**

"**Active Prospective Client**" means any Person, or group of Persons, which, in the two years preceding the Employment Cessation Date, any Hilb Company or either Seller had specifically identified as a potential client.

"**Client Account**" means the account of any client who or which (a) is serviced by a Hilb Company in connection with such Hilb Company's business, regardless of whether such services are provided by or through the licenses of a Hilb Company or any owner, employee or agent of a Hilb Company, or (b) was serviced by either Seller and acquired pursuant to the Purchase Agreement, regardless of whether a Hilb Company has yet provided services to such client or such services are provided by or through the licenses of a Hilb Company or any owner, employee or agent of a Hilb Company.

"**Competitive Services**" means any insurance or employee benefit consulting service that (a) engages in business in the same markets or jurisdictions as any of the Hilb Companies and (b) competes, or is reasonably anticipated to compete, with a product or service which any of the Hilb Companies has sold, marketed, distributed or developed in the last two years of Employee's employment with either Seller or any Hilb Company, or about which Employee has acquired Confidential Information.

"**Confidential Information**" means, at any date, any information defined as Trade Secrets, and any confidential or proprietary information of a Hilb Company that is not already generally available to the public (unless such information has entered the public domain and becomes available to the public through fault on the part of the party to be charged hereunder), from which a Hilb Company derives value by virtue of its not being known to others, and with respect to which a Hilb Company takes reasonable steps to maintain as confidential.

"**Goodwill**" means the expectation of continued patronage from client accounts and new patronage from prospective clients based on the Company's investment in repeated contacts, business transactions and other efforts to develop lasting client relationships.

"**Person**" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, a limited liability partnership or a governmental entity.

"**Trade Secrets**" means, at any date, any information of any of the Hilb Companies that is not already generally available to the public (unless such information has entered the public domain and becomes available to the public through fault on the part of the party to be charged hereunder), and which is valuable to any of the Hilb Companies and/or provides any of the Hilb Companies with a competitive advantage, including, but not limited to, the following: (a) the identity of any Active Prospective Clients and any clients of any of the Hilb Companies and any analyses and compilations thereof, (b) the identity, authority and responsibilities of key contacts and decision-makers employed by any Active Prospective Clients or any clients of any of the Hilb Companies, (c) the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of any Active Prospective Clients and any clients of any of the Hilb Companies, (d) the terms and conditions of the benefits and compensation plans of any Active Prospective Clients and any clients of any of the Hilb Companies, (e) information furnished to any of the Hilb Companies in confidence by its clients and Active Prospective Clients, (f) the business plans, marketing strategies and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of any of the Hilb Companies, and (g) any and all other information that constitutes a trade secret under the governing trade secrets laws.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**Company:**

The Hilb Group of New York, LLC

By: _____
Name:  Richard G. Spiro
Title:   Chief Executive Officer

**Employee:**

Name: _____

[Signature Page to Confidentiality Agreement]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**Company:**

The Hilb Group of New York, LLC

By: _____
Name:   Richard G. Spiro
Title:    Chief Executive Officer

**Employee:**

By: _Robert Vidal_ (signature)
Name:   Robert Vidal

**EXHIBIT A**

**Disclosures**

NONE